ROLLIE GALOWAY *v.* STATE.

(*Nashville.* December Term, 1917.)

1. **CONSTITUTIONAL LAW.** Due process of law.
Priv. Acts 1915, chapter 564, section 20, requiring the owner to furnish a wagon and team for road work, and feed therefor, does not violate Constitution article 1, section 8, providing that no man shall be deprived of his property, but by the judgment of his peers and the law of the land. (*Post, pp.* 486-493.)

Acts cited and construed: Acts 1915, ch. 564, sec. 20; Acts 1804, ch. 1, sec. 8.

Cases cited and approved: Toone v. Alabama, 178 Ala., 70; Franklin v. Maberry, 25 Tenn., 368; Chattanooga v. Southern R. Co., 128 Tenn., 399.

Cases cited and distinguished: Butler v. Perry, 240 U. S., 328; Goddard, Petitioner, 16 Pick. (Mass.), 504; State v. McMahon, 76 Conn., 97.

Constitution cited and construed: Art. 1, sec. 8.

2. **EMINENT DOMAIN.** Taking property for road work.
Neither does it, as to the wagon and team, violate Constitution article 1, section 21, forbidding the taking of property for public use without compensation; but as to the feed it does. (*Post, pp.* 493, 494.)

3. **STATUTES.** Partial invalidity. Effect.
The statute is not entirely invalid because of the invalidity of the requirement as to feed. (*Post, pp.* 493, 494.)

Cases cited and approved: Barron v. Memphis, 113 Tenn., 89; Posey Township v. Seniour, 42 Ind. App., 580; State v. Dawson, 3 Hill (S. C.), 100.

4. **HIGHWAYS.** Work on road. Impressment of wagons and teams.
The impressment of the wagon and team under the statute does

not depend on the owner's liability to perform personal service. (*Post, p.* 495.)

FROM MARSHALL.

Error to the Circuit Court of Marshall County.— W. B. TURNER, Judge.

R. E. HAYNES, for plaintiff in error.

FRANK M. THOMPSON, Attorney General, and ARMSTRONG, ARMSTRONG & MARSHALL, for the State.

MR. JUSTICE WILLIAMS delivered the opinion of the Court.

The plaintiff in error was convicted on an indictment which charged that he wilfully failed and refused to furnish a wagon and team for work on a public road, after having been legally notified and warned to do so.

The road law for Marshall county is Private Acts 1915, chapter 564. Section 20 of the act provides that any person owning a wagon and team shall be required to furnish same the full number of days required to work a district road; and it is further stipulated that the owner of said wagon and teams shall furnish the necessary feed for each team. A fine is provided to be imposed for a violation. It is said in

argument that similar provisions are to be found in statutes applying to other populous counties, such as Maury, Giles, Sumner, Lincoln, and Madison.

In behalf of Galoway it is assigned for error that the above statutory requirements are violative of article 1, section 8, of the Constitution of 1870, and also of article 1, section 21, of the fundamental law.

The case chiefly relied upon by plaintiff in error is *Toone* v. *Alabama,* 178 Ala., 70, 59 South., 665, 42 L. R. A. (N. S.), 1045, which holds that subjecting animals and implements suitable for road work in the county to that duty a certain number of days each year violates a constitutional provision forbidding the taking or applying to public use of private property without just compensation. This appears to be the only reported case that rules the point. We are not satisfied with the reasoning of, or the result reached by, the Alabama court, so far as its decision relates to wagons and teams sought to be made temporarily subject to road service.

The court in that case draws a distinction between the labor of an individual and the service of his animals and implements in that regard, thus:

"The books have been examined in vain for an authority which will authorize the exaction from a citizen of the contribution of his property for public service, under the theory that it is his duty as a citizen to so contribute. The State may exact the performance of this personal obligation, or provide a reasonable commutation for same by way of an assessment;

but it cannot confiscate his property by devoting it to public use.''

We are of opinion that the distinction was not well made. There was left out of view the legal history of the road duties imposed upon landowners, in the light of which history the constitutional provision should be read.

1. As to the conscription of wagons and teams of appellant:

"*Trinoda necessitatis*," meaning the three-fold necessary public duties, viz., repairing bridges, maintaining castles or garrisons, and going on expeditions to repel invasions, phrased the burden to which all owners of lands were held liable by the Saxon law. Black, L. Dict. and 38 Cyc., 1994.

Recently the supreme court of the United States had under review a statute of Florida which required every able-bodied male person over the age of twenty-one years, and under the age of forty-five years, to work on the roads and bridges of the county, and that court made this reference to the rule of the ancient law of the Saxons in England:

''In view of ancient usage and the unanimity of judicial opinion, it must be taken as settled that, unless restrained by some constitutional limitation, a State has inherent power to require every able-bodied man within its jurisdiction to labor for a reasonable time on public roads near his residence without direct compensation. This is a part of the duty which he owes to the public. The law of England is thus de-

clared in Blackstone's Commentaries, bk. 1, page 357:

" 'Every parish is bound of common right to keep the highroads that go through it in good and sufficient repair; unless by reason of the tenure of lands, or otherwise, this care is consigned to some particular private person. From this burthen no man was exempt by our ancient laws, whatever other immunities he might enjoy: this being part of the *trinoda necessitas,* to which every man's estate was subject, viz. *expeditio contra hostem, arcium constructio, et pontium raparatio.* For, though the reparation of bridges only is expressed, yet that of roads also must be understood; as in the Roman law, with respect to the construction and repairing of ways and bridges no class of men of whatever rank or dignity should be exempted.' " *Butler* v. *Perry,* 240 U. S., 328, 36 Sup. Ct., 258, 60 L. Ed., 672.

To quote further from Blackstone (page 358) is to demonstrate that upon local authorities were devolved the following duties:

"They are to call together all inhabitants and occupiers of lands, tenements and hereditaments within the parish, six days in every year to labor in fetching materials, or repairing the highways; all persons keeping draughts (of three horses, etc.), or occupying lands, being obliged to send a team for every draught, etc."

There was, as thus seen, from early times laws requiring the use of teams along with the personal services of the one subject to labor. The court in

*Butler* v. *Perry,* supra, partially traced this feature along with that of the conscription of personal service in early colonial and territorial statutes, noting that the legislative body of the Northwest Territory in 1792 provided for the warning in of inhabitants to work on the highways, every such one to repair to the place appointed "with such utensils and tools as may be ordered him wherewith he is to labor, etc." A like provision is to be found in the early legislation of our mother State, North Carolina. Laws N. C. 1784, chapter 14. Shortly after the admission of this State into the Union, it was by Acts 1804, chapter 1, section 8, provided that the overseer of roads should notify all owners of slaves to send their male servants from fifteen to fifty years of age to work the roads; and, by section 10, to give notice to owners what kind of tools they should "bring and work with" on the roads. It would seem that to impress human chattels was, if not a greater, then not a less, exertion of power than is the impressment of live stock.

Generally, and in this State, it is held that the police power may justify a municipality's requiring landowners to construct, at their own expense, sidewalks in front of their lots. *Franklin* v. *Maberry,* 6 Humph. (25 Tenn.), 368, 44 Am. Dec., 315, and cases in accord; note 28 L. R. A. (N. S.), 1132. The burden incident thereto is appreciably greater than the one imposed upon the estates of inhabitants of the rural districts by the statute here involved.

To the police power, rather than to the power of taxation, is referred the power of a municipality, under legislative grant, to require a lot owner to remove snow from the sidewalk in front of his holding, though it is apparent that to some extent he must use personal property, such as implements, in so doing. The exercise of the power does not conflict with constitutional inhibitions against the taking of private property for public purposes. The leading case is that of *Goddard, Petitioner,* 16 Pick. (Mass.), 504, 28 Am. Dec., 259; the opinion being delivered by Chief Justice SHAW. It embodies an *obiter* statement (italicized by us below) which bears upon the instant case; but a *dictum* from that eminent jurist is of great weight. It is said:

"It is not speaking strictly, to characterize this city ordinance as a law levying a tax, the direct or principal object of which is the raising of revenue. It imposes a duty upon a large class of persons, the performance of which requires some labor and expense, and therefore indirectly operates as a law creating a burden. But we think it is rather to be regarded as a police regulation, requiring a duty to be performed, highly salutary and advantageous to the citizens of a populous and closely built city, and which is imposed upon them because they are so situated as that they can most promptly and conveniently perform it; and it is laid not upon a few, but upon a numerous class, all those who are so situated, and equally upon all who are within the description com-

Galoway v. State.

posing the class. It is said to be unequal because it singles out a particular class of persons, to wit, the owners and occupiers of real estate, and imposes the duty exclusively upon them. If this were an arbitrary selection of a class of persons, without reference to their peculiar fitness and ability to perform the duty, the objection would have great weight, as, for instance, if the expense of clearing the streets of snow were imposed upon mechanics or merchants, or any other distinct class of citizens, between whose convenience and accommodation, and the labor to be done, there is no natural relation. But suppose there is a class of citizens who will themselves commonly derive a benefit from the performance of some public duty, we can see no inequality in requiring that all those who will derive such benefit shall by a general and equal law be required to do it. *Supposing a by-law should require every inhabitant, who keeps a cart, truck or other team, or a coach or other carriage, to turn out himself, or send a man, with one or more horses, after each heavy fall of snow, to assist in leveling it. Although other citizens would derive a benefit, . . . I can at present perceive no valid objection to a by-law requiring it on the ground of the inequality.* . . . In all these cases the answer to the objection of partiality and inequality is that the duty required is a duty upon the person in respect to the property which he holds, occupies and enjoys, under the protection and benefit of the laws; that it operates on each and all in their

turns, as they become owners and occupiers of such estates, and it ceases to be required of them when they cease to be such holders and occupiers of the estate, in respect to which the duty is required.''

As said on the same subject in *State* v. *McMahon*, 76 Conn., 97, 106, 55 Atl., 591, 594:

''To say that a law defining the duties of citizens in serving the State is necessarily a violation of the constitutional guaranties against the confiscation of property and partial and arbitrary discriminations, because the service in unpaid, or is one that all citizens are not in a situation to render, is to state a proposition which is radically unsound. Such a theory of selfish immunity from all duties inherent in citizenship is supported by no principle of political ethics, and cannot safely be reduced to practice under any government.''

The right of the State to enforce such an obligation we hold to be referable to its inherent police power to promote the safety, order, and comfort of society within its borders, as distinguished from the powers of taxation and eminent domain. *Chattanooga* v. *Southern R. Co.*, 128 Tenn., 399, 161 S. W., 1000, and cases cited.

The supreme court, in *Butler* v. *Perry,* supra, upheld a contention that limitations of the national Constitution there invoked should not be construed to run counter to ancient usages, unless it be compelled. Speaking of the Thirteenth Amendment to the federal Constitution, the court said that it introduced

no novel doctrine with respect to services always treated as exceptional, and certainly was not intended to interdict enforcement of those duties which individuals owe to the State. It was further held that, while personal services or labor must be considered as property, there was no merit in the contention that labor when so conscripted was property, the taking of which by the State without compensation, for the building or maintenance of public roads, could be denounced under the provisions of the Fourteenth Amendment. This answers · the attack made upon the · above statutory provision under article 1, section 8, of our Constitution.

So, also, we are of opinion that the taking of property, such as wagons and teams, along with the labor of individuals, for such use for five days each year, being one that had been recognized from the dawn period of our law, and through many generations prior to and after the organization of our State, should not be deemed to be a "taking" within the meaning of article 1, section 21, providing that no man's property shall be taken or applied to public use, without just compensation being made therefor. It is not a substantial or serious interference with private personal property materially lessening its value, but it is an impressment of the same for temporary service in an exigency which the legislature thought sufficient to bring it into requisition, the age-long legislative recognition of which, prior to the adoption of the Constitution,

argues against an intent to abrogate on the part of the makers of the fundamental law.

II. As to the provision in the statute that owners of teams shall furnish the necessary feed therefor:

We are of opinion that a different result must be declared in respect to the attempt to require the owner to furnish feed for his teams while in service on public roads.

Personal property equally with realty is subject to be taken under the power of eminent domain for a public use. 15 Cyc., 603.

The purpose of the act was not to press the feed into a temporary use, but to work its absolute appropriation. That appropriation must result, the articles being necessarily consumable in the use. *Barron* v. *Memphis,* 113 Tenn., 89, 80 S. W., 832, 106 Am. St. Rep., 810. There remains nothing to be returned to the owner. The argument of the Alabama court in the Noone Case is sound when applied to this feature of the statute.

Appropriation of timber for the construction of bridges, or of gravel or stone for the roadbed, may not be made without compensation, as under the law of eminent domain. *Posey Township* v. *Senour,* 42 Ind. App., 580, 86 N. E., 440; *State* v. *Dawson,* 3 Hill (S. C.), 100.

The invalidity of this particular provision of the statute does not bring the entire act to naught.

III. As to subjection of teams in the county belonging to a citizen and resident of another county:

The lands of plaintiff in error to be benefited by the road to be worked were situated in Marshall county and his wagon and team were permanently located there; and the latter were liable to road duty in that county, notwithstanding the fact that Galoway lived in an adjoining county.

It appears that the early usage, in this State at least, did not make the impressment of one's property dependent upon his liability to perform personal service. For example, a minister of the gospel was exempt in respect of personal labor, but he was required to send his slaves. We think this indicates the fair construction of the act under examination. Galoway is indicted, not for failure to work in person, nor yet for failure to furnish feed, but for a refusal to furnish his wagon and team.

Affirmed.