Argued and submitted January 25, decision of Court of Appeals reversed and case remanded to trial court September 6, petition for rehearing denied October 9, 1984

RICHARD VERLE EMERY et al,
*Respondents on Review,*

*v.*

STATE OF OREGON et al,
*Petitioners on Review.*

(TC 9072; CA A25025; SC S30042)

688 P2d 72

756

William F. Nessly, Jr., Assistant Attorney General, Salem, argued the cause and filed the brief for petitioners review. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem. With him on the reply brief was Stanton F. Long, Deputy Attorney General, Salem.

Robert L. Nash, Bend, argued the cause and filed the briefs for respondents on review. With him on the brief was Johnson, Marceau, Karnopp & Petersen, Bend.

CAMPBELL, J.

Linde, J., dissented and filed an opinion in which Lent, J., joined.

Roberts, J., dissented and filed an opinion.

## CAMPBELL, J.

The plaintiffs brought this action in Lake County to collect damages for the cost of repairs to their pickup truck. The issue of liability was submitted to the trial court on stipulated facts and cross motions for summary judgment. The trial court found for the plaintiffs and entered a judgment for damages in the amount of $2,000. The Court of Appeals affirmed. We reverse and remand.

The basic issue is framed by the parties' stipulation:

"This case presents an issue of law, which is whether or not the State of Oregon is obligated to pay just compensation to the owners of private property which is seized for use as evidence in a criminal case, and is damaged in the course of reasonably necessary tests performed in the state's investigation, and which is returned to its owners in its damaged condition when no longer needed for evidentiary purposes."

The plaintiff, Lorena Emery, is the mother of the plaintiff, Richard Emery. The plaintiffs are the owners of a 1977 Ford pickup truck.

On or about December 2, 1979, an altercation occurred between Richard Emery and David Sanchez near Paisley in Lake County, Oregon. The incident took place in and around the Emery pickup truck and resulted in the death of Sanchez.

Richard Emery was arrested and charged with murder. The pickup truck was seized by the state as evidence on a warrant. The state police crime laboratory officers dismantled portions of the pickup truck including the roof, headliner and door panels. A bullet hole was found in the headliner. State officers used the roof panel for ballistics tests to determine the caliber of the firearm and angle of fire.

The murder prosecution was dismissed when Richard Emery entered a negotiated plea of guilty to second degree manslaughter. The pickup truck was then returned to the plaintiffs in a dismantled condition with the roof and other parts removed. An auto body shop estimated that the cost of reasonable and necessary repairs to the pickup truck was the sum of $2,290.90.

This is not a tort case. No party has ever contended that it is. The parties stipulated:

"The seizure of the pickup truck, the dismantling of it and the tests performed by the state on the truck and its parts were reasonably necessary in the course of the state's criminal investigation."

██  ██  The plaintiffs contend that they are entitled to recover under either of two chief alternate theories: (1) The state is required by ORS 133.623 to 133.663 to return or restore property seized as evidence to its rightful owners in substantially the prior condition or pay damages, or (2) The state's acts were in effect an inverse condemnation wherein the pickup truck was "taken for public use" and the plaintiffs are entitled to "just compensation" under Article I, section 18, of the Oregon Constitution.[1]

The trial court found that the plaintiffs were entitled to prevail under their statutory theory while the Court of Appeals found that the state had "taken" the plaintiffs'

---

[1] The plaintiffs, as respondents, in their brief in the Court of Appeals make the bare statement: "There is also the common law right to compensation under the law of bailment." The argument is not renewed in the plaintiffs' response to the defendants' petition for review in this court. Even so, it appears that the plaintiffs' position is that if this court cannot affirm the judgment entered by the lower courts then the trial court was in error in failing to award them a judgment under the common law bailment. In *Artman v. Ray,* 263 Or 529, 533, 501 P2d 63, 502 P2d 1376 (1972), this court said:

"When the respondent is seeking to sustain the judgment he should not be required to cross-appeal from the judgment in order to preserve the appellate court's consideration [of] alleged errors by the trial court. * * * Although no cross-appeal is necessary, it is essential that the respondent unequivocally make the alleged error an issue on appeal and clearly contend that if the judgment cannot be sustained, the respondent is entitled to * * * other relief because of the alleged error of the trial court."

We have given the plaintiffs the benefit of the doubt and find that they fit within the *Artman v. Ray, supra,* rule, and that the common law bailment question is before this court. In that connenction we have reexamined the trial court file including the trial court briefs and the transcript of the oral argument before the trial judge and hold that the plaintiffs cannot prevail under the theory of common law bailment.

There is no express bailment. Assuming there was an implied bailment, the parties stipulated that the seizure of the pickup truck, the dismantling of it and the tests performed by the state were reasonably necessary in the course of the state's investigation. Some fault is necessary to recover on an implied bailment theory. Although the return of property in a damaged condition has been held to support recovery, *Carte v. Flury Buick-Jeep, Inc.,* 264 Or 479, 490, 506 P2d 701 (1973), in light of the parties' stipulation we can draw no inference of fault.

property for public use and was required to pay "just compensation" under the Oregon Constitution.[2]

We find that the plaintiffs are not entitled to recover under either theory and reverse and remand to the trial court to enter summary judgment for the defendants.

## THE PLAINTIFFS' STATUTORY CLAIM

ORS 133.633 in part provides:

"(1) Within 90 days after actual notice of any seizure, * * *:

"(a) An individual from whose person, property or premises things have been seized may move the appropriate court to *return* things seized to the person or premises from which they were seized."

"(b) Any other person asserting a claim to rightful possession of the things seized may move the appropriate court to *restore* the things seized to the movant." (Emphasis added.)

The plaintiffs contend under ORS 133.633(1)(b) the legislature intended that in addition to restoring possession of the seized property to the owner, the state is also required to restore the property to its previous condition.[3] In other words,

---

[2] The plaintiffs in their brief in the Court of Appeals cite and rely upon the Fifth Amendment of the United States Constitution in addition to Article I, section 18 of the Oregon Constitution. The Court of Appeals decided the case based solely upon the Oregon Constitution without any reference or mention of the Fifth Amendment. The plaintiffs have not cited or relied upon the Fifth Amendment in this court.

[3] The defendants in their opening brief in the Court of Appeals state:

"Plaintiffs rely upon the language of subsection (1)(b) [ORS 133.633(1)] which authorizes any person, other than the individual from whose person or property the item was seized, to move the court to 'restore,' a seized item. They contend that by use of the term 'restore,' the legislature contemplated not just that possession of the seized property would be restored to the owner, but that the property itself would be restored to its original condition."

The plaintiffs in their answering brief in the Court of Appeals do not question the above statement. The answering brief in part states:

"ORS 233.623-633 creates a summary statutory procedure in criminal trial courts under which the owners of seized property can regain possession, including a procedure for resolving conflicting claims for possession of the same property. These statutes speak in terms of the property being returned *or restored* to the owner when no longer needed for evidentiary purposes. * * * ORS 133.623-633 evidences a legislative intent that the private property used as evidence in criminal cases shall be returned *or restored* to its rightful owners when no longer needed by the State." (Emphasis in original.)

they argue that the defendants are required to give the 1977 pickup truck back to them in the same condition it was at the time of the seizure or pay damages. The trial court so held.

The legislature by enacting ORS 133.633 set out two separate classes of people who can file a motion to reclaim property seized by a search warrant: (a) "An individual from whose person, property or premises things *have been seized*", and (b) "Any other person *asserting a claim* to rightful possession of the things seized." People in the first class may file the motion "*to return* things seized", while people in the latter class may file the motion "*to restore* the things seized." (Emphasis added.)

The use of the different terms of "return" and "restore" by the legislature was not a slip of the pen. The phrase "the return or restoration of things seized" appears in each of the three sections that make up the balance of the statutory scheme (ORS 133.643, 133.653, and 133.663).

The defendants concede that the term "restore" may mean to repair or to bring something back to its previous condition, but point out that it may also mean to "give back or bring back."[4] The term "return" is a synonym of "restore." "Return" also means "to give back." Websters Third New International Dictionary (unabridged) 1941 (1971).

We determine that the legislature used the term "return" in ORS 133.633(1)(a) and the term "restore" in ORS 133.633(1)(b) because it perceived a distinction in the classes of people moving to reclaim the possession of property that had been seized. It placed a tight and limited definition on the term "return" and in effect used it to mean that property could only be "returned" to people and premises from whence it came. Having used a tight definition of "return" in ORS 133.633(1)(a) then the legislature needed a broader term to define the giving back of property to other persons claiming the right to possession under subdivision (b) and chose the word "restore." People in the latter category include the

---

[4] Cases from other jurisdictions have recognized that the term "restore" may vary depending upon the particular statute or contract. In *Redmon v. United States,* 471 F2d 687, 689 (6th Cir 1972), it was defined as "to give back (something which has been lost, or taken away); to make restitution of; to return." In *Leonardi v. Furman,* 83 Ariz 61, 65, 316 P2d 487, 490 (1957), the court held that a thing "is restored when it is put back to a former, original, normal or unimpaired condition."

owners of stolen property—their "rightful possession of the things seized" may be "restored."

■■ We hold that the legislature intended that persons under ORS 133.633(1)(b) are entitled only to the restoration of possession of the things seized and that the state is not required to repair or pay damages for any physical injury to the things during the seizure. To hold otherwise and follow the plaintiffs' contention would mean that persons claiming under ORS 133.633(1)(a) would be entitled only to the return of possession of the property seized while those qualifying under ORS 133.633(1)(b) would be able to collect damages. There is no logical basis for such a distinction and we hold that the legislature did not so intend.

Our conclusion in this matter is supported by the Criminal Law Revision Commission's commentary in drafting ORS 133.633:

"This subsection distinquishes the two sources from which * * * demands for return or restoration of property, may issue:

"(a) The person who is the object of the search and from whose possession the seizure was made, and

"(b) Some other person asserting rights of possession, generally on the ground that the person who was the object of the search had stolen the things. * * *.

"(2) * * * In most if not all circumstances, the legality of the search or seizure is not relevant to the disposition of a motion for return or restoration of the property. If possession of the things seized is unlawful, the state retains the things no matter how it got them. If stolen goods are involved and the true owner is on hand with undisputed evidence of title, he should have them *restored* whether or not the seizure by the police from the thief was proper or improper. If the seizure is for evidentiary purposes of things innocent in themselves, as for example an identifying garment or incriminating records, the lawfulness of the seizure goes only to the question of when they should be returned; when their evidentiary utility is exhausted, the owner should have back his overcoat or his business ledger. * * *." Criminal Law Revision Commission, Part II. (Emphasis added.) Pre-Arraignment Provisions, Article V, Search and Seizure, Preliminary Draft No. 2, p. 65-66.

The statutory scheme as a whole (ORS 133.623-.663) is keyed to the question of the return or restoration of the "rightful possession" of the property seized. This is particularly true of ORS 133.643 which sets out the grounds for motions seeking the return or restoration of the property seized.[5] The statute sets out five separate grounds for a motion to support a "valid claim to rightful possession." Nowhere does the statutory scheme make any reference to the restoration of the property seized to its former physical condition.[6]

---

[5] ORS 133.643:

"A motion for the return or restoration of things seized shall be based on the ground that the movant has a valid claim to rightful possession thereof, because:

"(1) The things had been stolen or otherwise converted, and the movant is the owner or rightful possessor; or

"(2) The things seized were not in fact subject to seizure under ORS 133.525 to 133.703; or

"(3) The movant, by license or otherwise, is lawfully entitled to possess things otherwise subject to seizure under ORS 133.525 to 133.703; or

"(4) Although the things seized were subject to seizure under ORS 133.525 to 133.703, the movant is or will be entitled to their return or restoration upon the court's determination that they are no longer needed for evidentiary purposes; or

"(5) The parties in the case have stipulated that the things seized may be returned to the movant."

[6] The Maryland Court of Special Appeals in the case of *In re Special Investigation No. 228*, 458 A2d 820, 54 Md App 149 (1983), examined a similar statute, Md. Ann. Code Art. 27 §551 (1982 Repl. Vol.) which provided in part:

"(b) If the criminal case in which property of a person was seized pursuant to a search warrant issued under subsection (a) of this section is disposed of because of (i) an entry of nolle prosequi, (ii) dismissal, or (iii) acquittal, or if the State does not appeal such a criminal case or if the time for appeal has expired, all property of the person, except contraband or any property prohibited by law from being recoverable, may be returned to the person from whom it belongs without the necessity of that person instituting an action for replevin or any other legal proceedings against the agency having custody of the property.

"(c)(1) If at any time, on application to a judge * * * it is found that property rightfully taken under a search warrant is being wrongfully withheld after there is not further need for retention of the property, the judge must cause it to be restored to the person from whom it was taken." 458 A2d at 822-823.

It is interesting to note that the above statutes use both the terms "return" and "restore." The Maryland court in describing the statutes said:

"Subsections (b) and (c) deal exclusively with possessory rights separate and apart from any question of unconstitutional or otherwise unlawful searches. They are easy to understand and to apply." 458 A2d 829.

## THE PLAINTIFFS' CONSTITUTIONAL CLAIM

The Oregon Constitution, Article I, section 18, provides in part:

> "Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation * * *."

The Constitution of the United States, Amendment V, provides in part:

> "* * * nor shall private property be taken for public use, without just compensation."

In *Cereghino et al v. State Highway Com.*, 230 Or 439, 444-45, 370 P2d 694 (1962), this court said: "The Fifth Amendment to the Constitution of the United States and Article I, section 18, of the Oregon Constitution are identical in language and meaning." Later in *Suess Builders v. City of Beaverton*, 294 Or 254, 259 n. 5, 656 P2d 306 (1982), we qualified that statement: "* * * the criteria of compensable 'taking for public use' under art I, §18, are not necessarily identical to those pronounced from time to time by the United States Supreme Court under the fifth amendment."

With the above background in mind, we examine the United States Supreme Court case of *Hurtado v. United States,* 410 US 578, 93 S Ct 1157, 35 LEd2d 508, (1973). Hurtado and other petitioners were citizens of Mexico who entered this country illegally. To assure the petitioners' presence as material witnesses at the criminal trials of others accused of bringing them into this country, the petitioners were required to post bail. When they failed to post bail, they were put in jail and were paid only one dollar for every day of their confinement. The petitioners filed an action for damages and argued that when the Government incarcerates material witnesses it has "taken" their property, and that the one dollar a day is not just compensation for this "taking" under the Fifth Amendment. Mr. Justice Stewart in writing for seven members of the court said at 410 US 588-89.

> "But the Fifth Amendment does not require that the Government pay for the performance of a public duty it is already owed. See *Monongahela Bridge Co. v. United States,* 216 US 177, 193 [30 S Ct 356, 54 L Ed 435] (modification of bridge obstructing river); *United States v. Hobbs,* 450 F.2d 935 (Selective Service Act); *United States v. Dillon,* 346 F. 2d 633,

635 (representation of indigents by court-appointed attorney); *Roodenko v. United States,* 147 F. 2d 752, 754 (alternative service for conscientious objectors); cf. *Kunhardt & Co. v. United States,* 266 U. S. 537, 540 [45 S Ct 158, 69 L Ed 428]. It is beyond dispute that there is in fact a public obligation to provide evidence, see *United States v. Bryan,* 339 U.S. 323, 331 [70 S Ct 724, 94 L Ed 884]; *Blackmer v. United States,* 284 U. S. 421, 438 [52 S Ct 252, 76 L Ed 375], and that this obligation persists no matter how financially burdensome it may be. The financial losses suffered during pretrial detention are an extension of the burdens borne by every witness who testifies. The detention of a material witness, in short, is simply not a 'taking' under the Fifth Amendment, and the level of his compensation, therefore, does not, as such, present a constitutional question. '[I]t is clearly recognized that the giving of testimony and the attendance upon court or grand jury in order to testify are public duties which every person within the jurisdiction of the Government is bound to perform upon being properly summoned, and for performance of which he is entitled to no further compensation than that which the statutes provide. The personal sacrifice involved is a part of the necessary contribution of the individual to the welfare of the public.' *Blair v. United States,* 250 U. S. 273, 281 [39 S Ct 468, 63 L Ed 979]." (Footnotes omitted.)

In *Daly v. Multnomah County,* 14 Or 20, 12 P 11 (1886), this court faced a similar question. Daly sued Multnomah County to recover the sum of $2.20 for one day's attendance and mileage as a witness in a criminal case. A statute in effect at that time provided "in all criminal actions * * * witnesses residing within two miles of the place of trial, * * * shall not be entitled to recover witness fees or mileage." The plaintiff contended that the statute was in direct conflict with that portion of Article I, section 18, of the Oregon Constitution which provides "nor [shall] the particular services of any man be demanded, without just compensation." This court through Chief Justice Lord said:

"We are unable to assent to this construction. In *Israel v. State,* 8 Ind. 467, it was held that the services of witnesses, in criminal cases, are not 'particular services' within the meaning of the constitution, but are of the class of general services which every man is bound to render for his own and the general good. The Court say: 'It is as much the duty and interest of every citizen to aid in prosecuting a crime, as it is to

aid in subduing any domestic or foreign enemy; and it is equally the interest and duty of every citizen to aid in furnishing to all, high and low, rich and poor, every facility for a fair and impartial trial when accused; for none is exempt from liability to accusation and trial. These are matters of general interest and public concern—are vital, indeed, to the very existence of free government, and render the services of witnesses on such occasions matters of general public interest, and not particular in the sense of the constitution.' " 14 Or at 21.

Although this court in *Daly v. Multnomah County, supra,*[7] considered a different phrase of Article I, section 18 of the Oregon Constitution than that involved in this case, it is interesting to note this court's reasoning in 1886 was similar to the United States Supreme Court's reasoning in the *Hurtado* case in 1973. Further, we can see no logical reason to make a distinction in the consideration of the taking of property and the demanding of services under our state constitution. Reasons which prevent certain acts or things from being a demanding of services under Article I, section 18, should also prevent similar acts or things from being a taking of property.

8 Wigmore, Evidence §2194, 76 (McNaughton rev, 1961) provides:

"If a person, by virtue of his very existence in civilized society, owes a duty to the community to disclose for the purposes of justice all that is in his control which can serve the ascertainment of the truth, this duty includes not only mental impressions preserved in his brain and the documents preserved in his hands, but also the corporal facts existing on his *body,* and the *chattels* and *premises* within his control. There can be no discrimination. The latter forms of disclosure, though more rarely asked for, may be no less necessary. They are included in the general duty.

"Apart from specific privileges, * * *, a person is bound, if required to furnish evidence by submitting his *corporal features,* his *chattels* and his *premises* to the inspection of the tribunal or its duly delegated officers, and to do or exhibit any

---

[7] In *Morin v. Multnomah County,* 18 Or 163, 22 P 490 (1889), the plaintiff sued to collect damages in the amount of $44 for being held in the county jail for a period of 14 days as a material witness without pay. The trial court entered a judgment for the plaintiff. This court reversed citing *Daly v. Multnomah County, supra.*

other thing which may in any form furnish evidence." (Footnote omitted; emphasis in original.)

Hurtado v. United States, supra, has been cited with approval in the following cases: *Williamson v. Vardeman,* 674 F2d 1211, 1215 (8th Cir 1982) (Requiring a lawyer to serve without compensation in a criminal defense is not taking property without just compensation); *In re Grand Jury No. 76-3 (MIA) Subpoena Duces Tecum,* 555 F2d 1306, 1308 (5th Cir 1977) ("As a general rule, a witness or the recipient of a subpoena duces tecum is required to bear the cost of compliance."); *United States v. Friedman,* 532 F2d 928, 935 (3rd Cir 1976) (No constitutional requirement that banks be paid for furnishing copies of its records pursuant to summonses); *Haldeman v. Freeman,* 558 F Supp 514, 519 (DC 1983) (Denied former White House Chief of Staff's action to collect damages for the seizure and retention of his personal diary); *In re Grand Jury Investigation,* 459 F Supp 1335, 1341 (E D Penn 1978) (Corporation denied costs of $2,199.80 to comply with subpoena); *In re Grand Jury Subpoena Duces Tecum, etc.,* 436 F Supp 46, 51 (D Md 1977) ("The bank's cost of compliance ($1,858) with this Grand Jury subpoena is part of the ncessary contribution to the welfare of the public."); *United States v. Covington Trust & Banking Co,* 431 F Supp 352 (E D Ken 1977) (Bank denied costs of $4,739.00 to comply with Internal Revenue Service summons).

It is apparent from the above cases that the federal law requires citizens to furnish without any compensation or adequate reimbursement services and things necessary to the support system of criminal trials.

■ ■  We agree with the United States Supreme Court's reasons and analysis in *Hurtado v. United States, supra,* and adopt the same as our own in construing Article I, section 18, of the Oregon Constitution. We also agree with Wigmore that every citizen must make available to the State chattels within his or her control for purposes of evidence without expectation of reimbursement.[8] We can see no reason to make a

---

[8] *Hurtado v. United States, supra,* 410 US at 589, n. 10 is as follows:

" '[I]t may be a sacrifice of time and labor, and thus of ease, of profits, of livelihood. This contribution is not to be regarded as a gratuity, or a courtesy, or an ill-required favor. It is a duty not to be grudged or evaded. Whoever is impelled to evade or to resent it should retire from the society of organized and civilized

distinction between the giving of oral testimony and the furnishing of physical evidence. The damage suffered by the plaintiffs' pickup truck while it was in the custody of the defendants simply was not "taking" within the meaning of our constitution.

This case boils down to the proposition that the Oregon Legislature has not seen fit to allow recovery for damages to property which has been lawfully seized. The legislature could have easily done so when it enacted ORS 133.623 through ORS 133.663.[9]

Reversed and remanded to the trial court for entry of summary judgment for the defendants.

**LINDE, J.,** dissenting.

The Court holds that when the state takes possession of private property for investigatory purposes and possible use as evidence, the state owes no compensation for the owner's loss when it fails to return the property or returns it in substantially destroyed, damaged, or valueless condition. I dissent, because the statutes that recognize the state's obligation to return or restore such property to its rightful owner obviously do not mean only whatever is left of the property when the state gets through with it.

A correct interpretation of the statutes is that private property is to be returned or restored to its rightful owner in substantially the same condition in which the state took possession of it. We deal here with lawfully owned private property of substantial value, not with contraband. If the state needs to disassemble, destroy, or substantially damage such property in the course of its investigation, the state either

---

communities, and become a hermit. He who will live by society must let society live by him, when it requires to.' 8 Wigmore, Evidence §2192, 72 (McNaughton rev 1961)."

[9] The Oregon Legislature has at least partially solved the witness fee problem raised in *Daly v. Multnomah County, supra,* to the extent that witnesses are now paid $5.00 per day and 8 cents per mile. ORS 44.410 and 44.430.

In *State v. Apodaca,* 252 Or 345, 449 P2d 445 (1969), the petitioner was a lawyer appointed to represent an indigent defendant. He spent 33 days in trial, eight other days away from his office, and 212 hours in additional trial preparation. The trial court awarded the petitioner the sum of $450 which was the maximum fee allowed by the existing statute. This court affirmed. The legislature has since amended the statute. *See* ORS 135.055.

must reassemble, repair, or replace the property or bear the owner's costs in having this done.

This was the perfectly sensible result reached by the circuit court. In a letter opinion, Judge Pihl wrote that "the Legislature has clearly spoken to the point that unless otherwise prohibited or restricted the property shall be returned to the person from whom seized." He understood this legislation to mandate that "the property shall be returned in substantially the same condition as it was seized for to say otherwise would amount to a 'taking' of property to the extent of damage by the state without just compensation * * *."

Whether or not constitutional rights were implicated, the circuit court was entirely right not to reach those implications when the legislature by statute had acknowledged the state's obligation toward the rightful owner of property that comes into the state's possession in administering the laws.

Unfortunately this sensible holding got lost in the course of the litigation. Plaintiffs, understandably wishing to cover alternative theories of recovery, coupled the statutory claim with theories based on bailment and on the constitutional law of taking property for public use. The Court of Appeals chose to consider the constitutional theory first, contrary to the long-established rule that there is no occasion to decide whether the state's law violates the constitution until it is determined that the state's law in fact denies the claimed right. *See, e.g., Planned Parenthood Association, Inc. v. Department of Human Resources of the State of Oregon,* 297 Or 562, 687 P2d 785 (1984); *State v. Spada,* 286 Or 305, 309, 594 P2d 815 (1979); *State v. Scurlock,* 286 Or 277, 281, 593 P2d 1159 (1979). This led the Court of Appeals into the labyrinth of "police power" doctrine and the conditions under which damage or destruction of private property for public purposes may become a compensable "taking." Eventually it affirmed the circuit court on constitutional grounds.

Faced with this holding, the majority in this court in turn needlessly pronounces some very questionable constitutional law. Those pronouncements are questionable because the state doubtless would have to pay compensation if it used plaintiffs' pickup truck for some other public purpose, for instance for transportation, and the compensation would take into account any diminution in value from wear and tear or

damage during the state's use. The majority's conclusion that failure to return or restore property used as evidence in unharmed condition does not require compensation, hangs entirely on an analogy with decisions holding that private persons have no constitutional claim to be compensated for serving as witnesses or jurors.

An argument indeed can be made that the temporary deprivation of an owner's possession of property is analogous to such service, that it is a public duty toward the administration of justice which was not meant to be turned into an economic transaction by the taking clauses of Article I, section 18 or the Fifth Amendment. *See, e.g., Hurtado v. United States,* 410 US 578, 93 S Ct 1157, 35 L Ed 2d 508 (1973) (no Fifth Amendment claim for just compensation for confinement as a material witness), *United States v. Friedman,* 532 F2d 928, 935 (3rd Cir 1976) (no Fifth Amendment claim to be paid for costs of furnishing copies of bank records pursuant to summonses); *Daly v. Multnomah County,* 14 Or 20, 12 P 11 (1886) (no claim for witness fees under Oregon Constitution Article I, section 18). There also are possible counterarguments, equally based on historic understandings of the difference between demanding a man's services and the use of his property. During much of this country's history, for instance, men were legally obliged to work a stated number of days on the public roads without pay, but this civic obligation was held not to include furnishing one's property to the state for the same project. *See Toone v. Alabama,* 178 Ala 70, 59 So 665 (1912).[1] But there is no need to pursue these analogies, for plaintiffs have made no claim to be compensated for the state's temporary taking of their pickup truck, and without such a claim the state understandably has not invoked any analogy to the public duty to testify or serve as a juror.

The majority's constitutional law also is questionable because it has no principled limits. First, it is by no means

---

[1]The Alabama Supreme Court wrote:

"The books have been examined in vain for an authority which will authorize the exaction from a citizen of the contribution of his property for public service, under the theory that it is his duty as a citizen to so contribute. The state may exact the performance of this personal obligation, or provide a reasonable commutation for same by way of an assessment; but it cannot confiscate his property by devoting it to public use. * * *"

limited to the present facts. Property used for evidence may belong to anyone, to a bystander, a landlord, or a business that happens to have the requisite item. The majority's holding would be the same if the vehicle cut up in the state's investigation belonged to Hertz or Avis. The holding would apply if the dismantled property was a Greyhound bus or someone's motor home, an expensive camera or a fine watch. It would be the same if the vehicle belonged to the victim of the crime or had been stolen from some third person. Under the majority's theory, all that these victims would be entitled to have returned or restored to them are the pieces left after the state destroyed the vehicle in its investigation.

Second, the state may and does empower its agencies to demand personal property for other than criminal investigations. If the state authorizes an administrative agency to take substantial private property from an individual or business for investigatory purposes, including administrative investigations unrelated to anything concerning the owner, the Court's constitutional theory implies that the owner is not entitled to return of essentially the same property or equivalent compensation. If the court intends a distinction based on whether the agency obtains the property by subpoena, by lawful seizure with or without a warrant, or by temporary occupation and partial destruction of real property for investigatory purposes, the basis for such a distinction is neither apparent nor explained.[2] Nor are there grounds to distinguish between evidence for investigations, for adjudications, or for rulemaking or government operations. Under the court's opinion, everyone's property is at risk to be used and not fully returned, without any compensation, so long as the intended public use of the property can be said to be "as evidence."

To repeat, these constitutional doubts are unnecessary. Rather, there is good reason not to bring the state's handling of private property seized for evidence prematurely into the complex constitutional formulas of taking and of just compensation, where it would be beyond legislative change,

---

[2]Destruction of property has been held not to be compensable when it is done to avert a danger of public importance, see, e.g. *Miller v. Schoene*, 276 US 272, 48 S Ct 246, 72 L Ed 568 (1928) and cases cited by the Court of Appeals, 64 Or App at 436, but that issue is not involved here. In this case we are not concerned with the destruction of property in order to render it harmless but with the use of otherwise harmless private property for a public purpose.

when there is in fact a legislative policy adequate to this case. ORS 133.623 to 133.663 provide for the return or restoration of seized property to the person whom the court finds to be entitled to its rightful possession. Assuming that a movant establishes a right to possession, the court may postpone execution of an order to return the property only "until such time as the things in question need no longer remain available for evidentiary use." ORS 133.652.

The statutes leave no doubt that the State of Oregon intends to respect the property interests of persons whose property it needs for evidentiary use. They also leave no doubt that the legislature intended valuable items of lawfully owned property to be returned or restored to the "rightful" possession of their owners essentially in the same form or condition in which the state took them. The majority discusses at length that "restore" in the statutes means "give back" rather than "repair," as if that disposed of the issue, but plaintiffs do not rest their claim on the meaning of "restore": "This argument misses the point of the statutes, which is that the State must give back what it takes, when no longer needed as evidence." The state would hardly argue that, if it took someone's live animal for evidentiary use, the state would satisfy the statutes if it returned a dead carcass. Nor can the state reasonably argue that when it seizes an operating vehicle, it has satisfied the statutes if it returns the dismantled pieces of the vehicle without an engine, wheels, or in this case, without a roof, windshield and other parts.

The statutes do not expressly prescribe the remedy for failure to return or restore property to its rightful owner. But the implicit remedy is that which is appropriate to other failures to return another's property. It does not arise from contract or tort. The question is not whether the legislature prescribed payment of "damages," as the majority puts it. Payment is not a sanction for having done something wrong; it is simply the cost of setting things right, of putting the property owner as nearly as practicable into the same position as if the state had given back his or her property unharmed. The object of the statutes is to avoid loss to the owner, not to judge the lawfulness or reasonableness of the officers' actions, which in this case are stipulated to have been reasonable.[3] The

[3] *Compare Dickens v. DeBolt,* 288 Or 3, 602 P2d 246 (1979), a tort action against an officer for conversion of evidence.

statutory scheme for return of property was not meant to turn into another form of review of police action.

Whether compensation is due in a given case depends on whether the statutes have been followed. I suppose that if the owner knew enough in advance to be concerned about the potential destruction of property in the state's hands, the statutes would entitle the owner to a protective order or perhaps a declaratory or injunctive order to assure that the property is maintained so that it can be returned or restored as the statutes prescribe. We are not dealing with minor scratches or depreciation while the property is held by the state, nor with evidentiary items whose value is *de minimis*. If the investigation requires that property must be dismantled, damaged, or consumed, such an order presumably would require that it be reassembled and repaired before being returned, or that it be replaced. If this has been done, there is no cause for compensation. In this case, the government could have reassembled or repaired the pickup truck, or it could have had the job done, presumably at the estimated cost of $2,290.90. It then could have complied with its statutory obligation to return or restore the vehicle to the person rightfully entitled to it. Because the government did neither and left those expenses to the owners, plaintiffs were entitled to recover them in this action.

Much concern is expressed these days about the rights of victims and bystanders in the administration of the laws. *See Wells v. Paulus,* 296 Or 338, 675 P2d 482 (1984). Looking beyond the present facts, the theory adopted by the majority deprives such persons along with all others of rights protected by Oregon law. The judgment of the circuit court should be affirmed.

Lent, J., joins in this dissenting opinion.

**ROBERTS, J.,** dissenting.

I dissent from the majority opinion because I believe the Oregon Constitution requires the state to compensate plaintiffs for the destruction of their pickup truck. I agree with the majority that the statutory terms "return" and "restore" have the same meaning. I disagree, however, that compliance

with either term can be achieved by the empty gesture of giving a person back the damaged pieces of his or her property.

When the legislature directed the state to "return the things seized" it must certainly have contemplated that, despite temporary seizure, "things" would retain some value to which the owner was entitled. What happens when the property that should be returned is rendered valueless by the state? The majority opinion, as I read it, concludes that the statute provides no answer and though the constitution presents an answer, it does not apply. I disagree. I would hold, for the reasons developed below, that article I, section 18 of the Oregon Constitution requires the state to make just compensation when it appropriates property to be used as evidence in a criminal investigation and alters or damages it so extensively that the property is no longer useable by the owner. I would interpret ORS 133.633 consistently with this constitutional mandate.

The majority sets a precedent of very dangerous breadth when it holds that the state may seize the property of individuals and alter, mutilate, or destroy it without being responsible to the owner in any way. The majority forecloses recovery by any property owner, including crime victims and third persons who may have no connection at all to the investigation. This case involves seizure of property pursuant to a search warrant issued for a criminal investigation. However, many state agencies have subpoena power by which they temporarily can demand property. Were such an agency to destroy the property in the pursuit of some legitimate regulatory function, the majority's constitutional analysis presents no distinction why it too could not avoid its constitutional obligation to compensate the property owner.

The majority concludes that there is no taking within the constitutional meaning when the state destroys property in its development of evidence, and that ORS 133.623 through 163.663 has failed to provide for compensation in these instances. Since that is the prevailing opinion of this court, it would appear that if Oregon citizens are to be compensated for the state's destruction of their property it is up to the legislature to act to insure that protection.

Article I, section 18 requires the state to make compensation when it deprives persons of their private property.

The majority's analysis may support the conclusion that the temporary use by the state of private property is, like a trial-related personal service, noncompensable. It is not enough to conclude, however, that because one has an historic public duty to participate temporarily as a witness or juror at trial without compensation, one's private property may be taken without compensation toward the same end, and used, tested and substantially damaged in a manner that results in a permanent deprivation.

The majority states: "We can see no reason to make a distinction between the giving of oral testimony and the furnishing of physical evidence." Slip op. at 12. In fact, there are two reasons to make such a distinction. The first is the historically different treatment courts have afforded the constitutional requirement of compensation for "particular services" as distinguished from that given compensation for "private property." The second reason lies in the nature of the deprivation at issue in this case. The deprivation that attends witness or jury service, though potentially lengthy, nonetheless remains temporary. The deprivation that results when the state substantially destroys private property in the development of evidence is permanent.

Article I, section 18 provides:

"Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation. * * *"

Neither the federal constitution nor any other state constitution with the exception of Indiana and Tennessee contains the requirement that government pay for the particular services it may demand.[1] The language in our constitution is similar to language in the Indiana Constitution of 1851:

"No man's particular services shall be demanded, without just compensation. No man's property shall be taken by law, without just compensation; nor, except in the case of the State, without such compensation first assessed and tendered."[2] Article I, section 21, Ind Const.

---

[1]None of the original Declarations of Rights or early constitutions contained such a provision. This includes the Delaware, Pennsylvania, and Massachusetts Declarations of Rights, which have virtually identical provisions, as well as those of Virginia, Maryland, Carolina, Connecticut, Georgia, New York, and Vermont.

[2]As for its antecedent, Indiana had such a provision in its original Constitution of 1816. The phrase appears in the Northwest Ordinance of 1787, which provided:

Indiana and Tennessee cases, many of which were in existence at the time our constitution was drafted, developed an analysis for the terms "particular services" independently from their analysis for taking of "property." For example, in *Israel v. The State,* 8 Ind 467 (1857), the Indiana court distinguished between "general" and "particular" services, and determined that the services of a witness in a criminal trial was "general," so as to be outside the coverage of the compensation requirement. In *Falkenburgh v. Jones,* 5 Ind 296 (1854), the court distinguished "official" from "particular" services, holding that the state could require a clerk of the court to provide a free transcript to a pauper. The court stated that although services of attorneys cannot be required free of charge, *see Blythe v. The State,* 4 Ind 525 (1853) and *Webb v. Baird,* 6 Ind 13 (1854), officers entitled to fees or salaries fixed by law are at liberty to resign, and do not perform "particular" services within the meaning of the Indiana Constitution.

A Tennessee case reflects a similar analysis. In *Henley v. State,* 98 Tenn 665, 41 SW 352 (1897), the court upheld a law under which states and counties were not liable for fees of witnesses, clerks of the court, sheriffs and magistrates, and costs in many criminal prosecutions. The court explained that "[p]articular services must mean peculiar services; limited services; not ordinary or general services of an individual." 98 Tenn at 684.

As the majority notes, this court has also recognized a class of exceptions from the requirement that the government compensate mandated services. In *Daly v. Multnomah County,* 14 Or 20, 12 P 11 (1886), when faced with the question whether article I, section 18 required compensation of witnesses compelled to testify in criminal cases, the court cited *Israel v. State, supra,* and denied the existence of such a right.

---

"No man shall be deprived of his liberty or property but by the Judgment of his peers or the law of the land, and should the public exigencies make it necessary for the common preservation to take any persons property *or to demand his particular services,* full compensation shall be made therefor * * *."

Northwest Ordinance of 1787, Article 2 (Emphasis added). Although Ohio, Illinois, Michigan, and Wisconsin, the other states carved out of the Northwest Territories did not adopt this constitutional provision, their neighbor to the south, Tennessee, did so in 1796.

Article I, section 18 required compensation only of "particular services" and not "general services." 14 Or at 22. *Morin v. Multnomah County,* 18 Or 163, 22 P 490 (1889), used the same distinction to withhold compensation from a witness who was detained in jail until trial because he was unable to produce the security necessary to guarantee his appearance at trial.

Thus, the three states which share the constitutional requirement that compensation be made for the "particular services" demanded have adopted a similar analytical framework for answering whether a given legal duty gives rise to a cause of action for inverse condemnation. The inquiry has historically involved a determination of whether a compelled service is "official," "general," or "particular," terms which do not have meaning beyond the context of the provision of human labor. Therefore, I cannot agree with the majority that Oregon cases utilizing this analysis, which in turn rely on cases from other jurisdictions interpreting identical clauses, are definitive in interpreting a separate clause involving "property."

The difference in analysis between demanding services without compensation and taking property without compensation is well illustrated in two cases addressing the requirement, developed in England and imported to the American colonies, that able-bodied men must work without compensation to construct and maintain public roads. An act of the General Assembly of the Northwest Territory describes the duty:

> " 'That all male persons of the age of twenty-one years, and not exceeding fifty, who have resided thirty days in any township of any county within this territory, who are not a township charge, shall over and above the rate of assessment hereinafter mentioned, be liable, yearly and every year, to do and perform two days work on the public roads, under the direction of the supervisor within whose limits they shall be respectively residents.' (Sec. 10, Chapter 28 of Northwest Territory Acts, 1799)." (Quoted in *Butler v. Perry,* 240 US 328, 332, 36 S Ct 258, 60 L Ed 672 (1916).

The requirement for uncompensated road labor was held not to violate the federal thirteenth amendment's proscription against slavery and involuntary servitude, on the theory that road maintenance work was one of the traditional duties an individual owes to the state "such as services in the

army, militia, on the jury, etc." *Butler v. Perry,* 240 US 328, 333, 36 S Ct 258, 60 L Ed 672 (1916).[3]

Some states also required road workers to provide use of their teams and wagons, as well as feed for their horses. Challenges arose to the state's appropriation of this private property. *Toone v. The State,* 178 Ala 70, 59 So 665 (1912), considered the propriety of the state's demanding labor and use of teams, wagons and tools for road work. The court found that the requirement to labor on the roads without compensation was a duty "like unto that enjoined upon citizens to serve in person in the militia, etc., and seems to be a mere personal obligation due from the subject, and does not entail upon him the duty of furnishing his property in connection with his personal service. * * *" 178 Ala at 74. However, the obligation to furnish personal property for use in the endeavor did not follow from the duty to provide services. The court stated:

"The books have been examined in vain for an authority which will authorize the exaction from a citizen of the contribution of his property for public service, under the theory that it is his duty as a citizen to so contribute. The state may exact the performance of this personal obligation, or provide a reasonable commutation for same by way of an assessment; but it cannot confiscate his property by devoting it to public use. Section 23 of the [Alabama] Constitution, among other things, says: 'But private property shall not be taken for or applied to public use, unless just compensation be first made therefor.' It may be true, that the taking of the property under the act would be for only a few days; but this would nevertheless, be a taking or a compulsion to produce under penalty for a default." 178 Ala at 74.

The Supreme Court of Tennessee was faced with the same issues in *Galoway v. State,* 139 Tenn 484, 202 SW 76 (1917). By statute in Tennessee a person not otherwise exempt was required to furnish, in addition to his own labor, a wagon and team, if he owned one, for road work for a fixed number of days per year. The person was also required to furnish feed for his team. The court considered *Toone v. The*

---

[3]Challenges to road maintenance duty arose in the state courts as well. The prevailing view seems to have been that the state can demand these services without compensation because road maintenance, like jury service, was an historic public duty for which no compensation was due. 1 Elliott, A Treatise on the Law of Roads and Streets, § 480 (3d ed 1911) and cases cited therein at notes 86 and 87.

*State* and its prohibition on using animals and implements for road work without compensation and was not satisfied. The court found a quote from Blackstone which indicated that the traditional road work duty included the requirement that persons obliged to work bring their teams with them.[4] The court concluded from this that "[t]here was * * * from early times laws requiring the use of teams along with the personal services of the one subject to labor." 139 Tenn at 488. The court's analysis is as follows:

> "[W]e are of opinion that the taking of property, such as wagons and teams, along with the labor of individuals, for such use for five days each year, being one that had been recognized from the dawn period of our law, and through many generations prior to and after the organization of our State, should not be deemed to be a 'taking' within the meaning of article 1, section 21, providing that no man's property shall be taken or applied to public use, without just compensation being made therefor. It is not a substantial or serious interference with private personal property materially lessening its value, but it is an impressment of the same for temporary service in an exigency which the legislature thought sufficient to bring it into requisition, the age-long legislative recognition of which, prior to the adoption of the Constitution, argues against an intent to abrogate on the part of the makers of the fundamental law." 139 Tenn at 493-94.

But furnishing feed required an independent analysis:

> "We are of opinion that a different result must be declared in respect to the attempt to require the owner to furnish feed for his teams while in service on public roads.

> "Personal property equally with realty is subject to be taken under the power of eminent domain for a public use. * * *

> "The purpose of the act was not to press the feed into a temporary use, but to work its absolute appropriation. That appropriation must result, the articles being necessarily consumable in the use. * * * There remains nothing to be returned

---

[4] "[The roads supervisors] are to call together all inhabitants and occupiers of lands, tenements and hereditaments within the parish, six days in every year to labor in fetching materials, or repairing the highways; all persons keeping draughts (of three horses, etc.), or occupying lands, being obliged to send a team for every draught, etc." Blackstone, page 358, quoted in *Galoway v. State,* 139 Tenn 484, 488, 202 SW 76 (1917).

to the owner. The argument of the Alabama court in the Noone Case is sound when applied to this feature of the statute.

"Appropriation of timber for the construction of bridges, or of gravel or stone for the roadbed, may not be made without compensation, as under the law of eminent domain." (Citations omitted.) 139 Tenn at 494.[5]

It is no accident that both courts maintained a discrete analysis for services on the one hand and property on the other. Alabama found an historical exception to the compensation requirement for road work services but not for use of private property. Tennessee relied on an historical exception for both road work services and temporary use of private property in furtherance of this public duty. However, the existence of a public duty to provide certain services to the state without compensation provided no justification for an uncompensated permanent appropriation of property.

In the case before us, dismantling petitioner's vehicle, subjecting it to ballistics tests and returning it in pieces exceeded a temporary use. The truck was "necessarily consum[ed]" in the process of testing, 139 Tenn at 494, and for this the constitution requires compensation. I have no doubt that had the state taken private property and used it up completely, as might occur, for example, were the state to appropriate chemicals it thought necessary for testing items of evidence, ORS 133.633, which is expressive of the foregoing constitutional principles, would compel the return or restoration of the chemicals, or compensation in lieu of statutory

---

[5]Under Oregon laws in effect both before and at the time of the enactment of the state constitution, "every male between twenty-one and fifty years of age, except persons who are a public charge, or too infirm to perform labor" was required to donate two days work to road maintenance or suffer a fine. General Laws of Oregon §§ 22-24 (Deady & Lane 1874). The supervisor of roads was empowered to order the laborers to furnish their teams, wagons and implements for the road work but the supervisor was required to allow a reasonable compensation for the use of such property:

"[The] supervisor may, if he deem it necessary, order any person (owning the same) to furnish a team of horses, mules or oxen, and wagon, cart, scraper or plow, to be employed or used on the roads under the direction of such supervisor, who shall allow such person a reasonable compensation for the use of such team, wagon, cart, scraper or plow, in discharge of any labor due from such person." General Laws of Oregon § 26 (Deady & Lane 1874).

In this regard the Oregon statutes reflect a position close to Alabama's that even a temporary use of private property for road work must be compensated.

compliance. This statute negates the majority's notion that the legislature expects an owner to part permanently with property without compensation, because the state needs it as evidence. Rather, the statute reflects an analysis similar to the Tennessee court's, that when the state's use of private property "work[s] its absolute appropriation" so that "[t]here remains nothing to be returned to the owner," a taking has occurred for which compensation is due.

Our own cases addressing compensable takings develop this theme more fully. In *Morrison v. Clackamas County,* 141 Or 564, 569, 18 P2d 814 (1933), we recognized that it was "not necessary that the owner of property be actually dispossessed or that the property be completely destroyed in order to constitute a taking within the meaning of the constitutional provisions." Two cases, *Moeller v. Multnomah County,* 218 Or 413, 345 P2d 813 (1959), and *Tomasek v. Oregon Highway Com'n,* 196 Or 120, 248 P2d 703 (1952), consider when property damage becomes so substantial as to constitute a taking of constitutional proportion. In *Moeller* we summarized our cases on this issue as follows: "Most of [the Oregon cases] have involved flooding and erosion, but the 'taking' has deprived the owner of a substantial part of his property as well as the use thereof, and usually permanently." 218 Or at 427.

In summary, I am in agreement with the Court of Appeals that a motor vehicle is unquestionably "property" under article I, section 18. And petitioner's property was "taken" in the constitutional sense when it was "damaged to the extent that it require[d] over $2000 in repairs * * *." 64 Or App 429, 435, 668 P2d 484 (1983). I would hold that when the state appropriates property as evidence in a criminal trial not for temporary use but for a "consumable" purpose which would result in altering or damaging the property so extensively that it is rendered valueless to the owner, the state must make compensation.