Hillsborough
No. 84-446

## ROLAND M. SOUCY & a.

### v.

## THE STATE OF NEW HAMPSHIRE

December 5, 1985

452

*Cullity & Kelley*, of Manchester (*John C. Boeckeler* on the brief and orally), for the plaintiffs.

*Stephen E. Merrill*, attorney general (*Peter C. Scott*, assistant attorney general, on the brief and orally), for the State.

SOUTER, J.  This is an action for compensation for what the plaintiffs claim was a taking of their property by the State. They argue that the superior court effected the taking at the behest of the defendant in an arson case, by an order preventing the repair of the plaintiffs' partially destroyed building, so that its damaged condition could be considered as evidence. The superior court granted the State's motion to dismiss for failure to state a claim on which relief might be granted. We affirm.

At all relevant times the plaintiffs owned a Manchester apartment building, which was extensively damaged by fire in July, 1982. In August, 1982, one Susan Beardsley was charged with the arson of the building. At about the same time, Beardsley's counsel petitioned the superior court for an order to seal the building so that its damage could be preserved for a jury view. The State indicated that it did not desire a view but did not oppose the defendant's request, which the Court (*Wyman*, J.) then granted.

In February, 1983, the court allowed the plaintiffs to intervene in the criminal case for the purpose of moving to modify the protective order. At a hearing in March, 1983, the plaintiffs asked the court to vacate the order so that they could sell or renovate the damaged building. The Court (*Goode*, J.) denied the motion. In April the same judge denied the plaintiffs' motion for a rehearing and observed that there was no State action depriving the plaintiffs of their property. The plaintiffs appealed that order to this court (No. 83-200), but

while the appeal was pending the State entered nolle prosequi to the charge against Beardsley. The plaintiffs then withdrew their appeal and brought this action for damages.

The theory of recovery pleaded in the declaration is that the order to preserve the building in its damaged state, for use as evidence on the anticipated jury view, abridged the plaintiffs' rights as property owners, as guaranteed by part I, article 2 of the Constitution of New Hampshire and by the fifth and fourteenth amendments of the Constitution of the United States. The plaintiffs accordingly argue that the court's order should be treated as a taking of property by inverse condemnation, for which they are entitled to compensation under part I, article 12 of the State Constitution and under the fifth and fourteenth amendments.

The State moved to dismiss the action on several grounds, including the failure of the declaration to state a claim on which relief might be granted. The Superior Court (*Cann*, J.) granted the motion, and the plaintiffs appealed.

We will first address the compensation claim under the State Constitution, *see State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983), citing decisions of the Supreme Court of the United States and of courts of other jurisdictions only as aids to our independent State analysis. *See Michigan v. Long*, 103 S. Ct. 3469, 3476 (1983). Thereafter we will consider federal issues only to determine whether the Constitution of the United States would support the plaintiffs' claims where the State Constitution would not. *See State v. Ball*, *supra* at 232, 471 A.2d at 351.

The State constitutional issue is one of first impression and apparently one seldom raised elsewhere. Despite the novelty of the question, however, both the plaintiffs and the State assert their opposing positions on the basis of prior State law dealing with the right to compensation when the government takes private property. It will, therefore, be useful to begin with a summary of that existing law.

██ The State's obligation to pay for what it takes has its origin in two constitutional provisions. Part I, article 2 describes the rights of acquiring, possessing and protecting property as natural, essential and inherent. Accordingly, part I, article 12 has been interpreted from a very early date to require the payment of just compensation when a "part of a man's property [is] taken from him, or applied to public uses." N.H. CONST. pt. I, art. 12; *Piscataqua Bridge v. New Hampshire Bridge*, 7 N.H. 35, 66–70 (1834). This obligation is said to be "self-executing," in the sense that it is enforceable without an affirmative waiver of any governmental immunity from suit. *N.H. Water Resources Board v. Pera*, 108 N.H. 18, 19–20, 226 A.2d 774, 775 (1967).

Since abridgments of property interests do not necessarily require transfer of title, a body of case law has developed to identify those governmental interferences that are sufficiently serious to be regarded as compensable takings. The cases are characteristically concerned with regulations, like zoning ordinances, which are enacted in the exercise of the police power for the purpose of limiting an owner's use of his·land. *See Metzger v. Town of Brentwood*, 117 N.H. 497, 502, 374 A.2d 954, 957 (1977).

■■ The police power is legislative in nature, to enact "general regulations . . . necessary to the common good and general welfare." *State v. Griffin*, 69 N.H. 1, 23–24, 39 A. 260, 261 (1896) (quoting Shaw, C.J., in *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53, 84–86 (1851)). The power is said to derive from part II, article 5 of the constitution, *State v. Griffin supra*; *State v. Ramseyer*, 73 N.H. 31, 58 A. 958 (1904), although it is inherent in the nature of the legislative power itself. *Burrows v. City of Keene*, 121 N.H. 590, 596, 432 A.2d 15, 18–19 (1981).

The cases that set the line between a non-compensable exercise of the police power and a compensable taking have culminated in *Burrows v. City of Keene supra*.

> "Reasonable regulations that prevent an owner from using his land in such a way that it causes injury to others or deprives them of the reasonable use of their land may not require compensation. *See Penn Central Transp. Co. v. New York City*, 438 U.S. at 144–45 (Rehnquist, J., dissenting) (quoting *Mugler v. Kansas*, 123 U.S. 623, 668–69 (1887)); *Sibson v. State*, 115 N.H. at 128, 336 A.2d at 242. Nor do reasonable zoning regulations which restrict economic uses of property to different zones and which do not substantially destroy the value of an individual piece of property effect a taking requiring compensation. But arbitrary or unreasonable restrictions which substantially deprive the owner of the 'economically viable use of his land' in order to benefit the public in some way constitute a taking within the meaning of our New Hampshire Constitution requiring the payment of just compensation. *See Sundell v. Town of New London*, 119 N.H. at 845, 409 A.2d at 1318; *Metzger v. Town of Brentwood*, 117 N.H. at 503, 374 A.2d at 958. It is a matter of degree. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. at 416. The owner need not be deprived of all valuable use of his property. If the denial of use is substantial and is especially onerous, a taking occurs. There can be no set test to determine when regula-

tion goes too far and becomes a taking. Each case must be determined under its own circumstances. The purpose of the regulation is an element to be considered. *See Agins v. Tiburon*, 447 U.S. at 260–62."

*Burrows v. City of Keene*, 121 N.H. 590, 598, 432 A.2d 15, 19–20 (1981).

Each party in the present case cites this law to us. The State argues that the superior court's order was a reasonable exercise of the police power; the plaintiffs argue that *Burrows* requires us to rule that a compensable taking occurred. We do not, however, accept either position. To understand why, it is necessary to attend carefully to what *Burrows* does, and what it does not, hold.

Although *Burrows* decided, in words quoted above, that a "denial of [property] use [that] is substantial and . . . especially onerous, [is a compensable] taking," it is important to remember, as we have already noted, that *Burrows* and its predecessors were characteristically dealing with the effects of regulations adopted in the exercise of the police power. Cases in the *Burrows* line have not, however, dealt with the effects of court orders like the order before us here. The object of the superior court's order was the efficacy of the trial process to determine relevant facts when guilt and innocence are in issue, and the order can only be viewed as an exercise of the judicial power. *See* N.H. CONST. pt. I, art. 37.

■ Since *Burrows* did not deal with the judicial power, it is authority in the present case only to a very limited extent, in its holding that not every governmental interference with property interests is compensable. Beyond that, we must look elsewhere for guidance. In doing so, it is not surprising that the pursuit of the essential judicial objective that we have described has a long history of its own, which bears on the issue now before us.

"For more than three centuries it has now been recognized as a fundamental maxim that the public (in the words sanctioned by Lord Hardwicke) has a right to every man's evidence." 8 J. WIGMORE, EVIDENCE § 2192, at 70 (J. McNaughton rev. 1961), *quoted in United States v. Bryan*, 339 U.S. 323, 331 (1950). Dean Wigmore has described how the cost of this duty has fallen on the citizen who owes it, not upon the government that enforces it:

"[I]t may be a sacrifice of time and labor, and thus of ease, of profits, of livelihood. This contribution is not to be regarded as a gratuity, or a courtesy, or an ill-required favor. It is a duty not to be grudged or evaded. Whoever is impelled to evade or to resent it should retire from the

> society of organized and civilized communities, and become a hermit. He who will live by society must let society live by him, when it requires to."

8 J. WIGMORE, EVIDENCE § 2192, at 72 (J. McNaughton rev. 1961), *quoted in Hurtado v. United States,* 410 U.S. 578, 589 n.10 (1973). Finally, Wigmore concluded that the subjects of the duty included "not only mental impressions preserved in [a witness's] brain and the documents preserved in his hands, but also . . . the *chattels* and *premises* within his control. There can be no discrimination." 8 J. WIGMORE, *supra* § 2194, at 76 (emphasis in original); *Emery v. State,* 297 Or. 755, 766–67, 688 P.2d 72, 79 (1984); *see Haldeman v. Freeman,* 558 F. Supp. 514, 519–20 (D.D.C. 1983); *United States v. Friedman,* 532 F.2d 928, 934–35 (3rd Cir. 1976) (bank not entitled to reimbursement for cost of compliance with I.R.S. summons of a customer's records); *In re Grand Jury No. 76-3 (MIA) Subpoena Duces Tecum,* 555 F.2d 1306, 1308–09 (5th Cir. 1977) (no entitlement to reimbursement for cost of complying with subpoena duces tecum).

Historically, then, the financial burden of providing evidence at the direction of a trial court has not been regarded as a compensable taking. Since, as we have noted, *Burrows* holds that not every governmental interference with the use of private property is compensable, it follows that there is no necessary inconsistency between the historical rule described by Wigmore and the compensation requirement of article 12. The issue before us thus becomes one of constitutional policy, whether we should continue to adhere to the rule of no compensation for restrictions on the use of property with evidentiary value.

The issue must necessarily be resolved by balancing the respective interests of society and property owners, a process not essentially different from the analysis that *Burrows* exhibits. Since the general rule that we ultimately derive should rest on an analysis of facts generally prevailing, *see United States v. Sewar,* 468 F.2d 236, 238 (9th Cir. 1972), we look to the characteristic private burdens imposed by restrictions on the use of evidentiary property and the social cost that compensating such restrictions would impose.

The restrictions placed on an owner's use of property with evidentiary significance are not normally comparable to the limitations on land use that would require compensation under *Burrows*. When physical evidence is obtained by subpoena, or impounded *in situ* as in this case, the restriction on the owner's use of his property is not only justified by the need for the evidence in a specific prosecution, but limited by the duration of that prosecution. That limited duration of the restriction, reflecting the limited evidentiary need, will

usually stand in sharp contrast to the permanent or indefinite police power limitations on property rights that are compensable under *Burrows. Cf. Capitol Plumbing & Heating Supply Co v. State,* 116 N.H. 513, 363 A.2d 199 (1976).

Moreover, there will often be a further limit on the scope of evidentiary need and on the consequent burden of restrictions on the use of evidentiary property. The need for the evidentiary value inherent in a piece of property will not always require that use of the property be restricted until the time of trial. Where evidentiary significance can be adequately preserved by photographs or other records of probative characteristics, the need to restrict the use of the property will not extend beyond the time reasonably necessary to take the pictures or make the records. In fact, resorting to facsimiles or duplicates is a frequent practice when dealing with written records, *see* RSA 520:1; N.H. R. Ev. 1003, and RSA 595-A:6 (Supp. 1983) provides for the admissibility of such secondary records of physical objects. When facts about real estate are in issue, it is a matter of common practice to receive photographs into evidence, if they are fair and accurate representations of the property in question. *See LaPerle v. Swanson,* 92 N.H. 5, 6, 24 A.2d 269, 270 (1942); *Palmer v. Edgerly,* 87 N.H. 391, 394–95, 181 A. 125, 128 (1935).

These opportunities to substitute records or secondary evidence in place of primary evidentiary objects thus underscore the distinction between the respective burdens that tend to result from exercises of the police power and the judicial power over evidence. But whether evidentiary need requires no more than secondary records or demands the use of primary physical objects, the conclusion is the same: insofar as the restrictions on the use of evidentiary property are limited to evidentiary need, those restrictions cannot be called arbitrary or substantial, as *Burrows* uses those terms.

When we turn to assess potential cost of the relief that the plaintiffs seek, it appears that any rule that would treat restrictions on an owner's use of evidentiary property as a compensable taking would place a heavy burden upon the public. The burden would comprise not only the money necessary to pay the property owners, but also the cost of valuing the restrictions that would require compensation. In disputed cases, the judiciary would have to make such valuations on an item by item basis, and the burden of time necessary to do this is not to be assumed lightly by a judiciary that is already too busy.

The burden of a rule requiring compensation would become even greater, of course, if the same principle of compensation were to be extended to cover the limitations on personal freedom necessary to

enforce the obligation of a witness to attend the court and give testimony. It is difficult to see, however, why a principle that would require compensation for a restriction on an owner's right to use the evidence that he owns should not apply with equal force to a restriction on a witness's liberty. 8 J. WIGMORE, *supra* § 2194, at 76; *Emery v. State*, 297 Or. 755, 688 P.2d 72. Article 12 protects liberty as well as property, and the value of a witness's time is no less worthy of recognition than the value of his interest in using his possessions. If the plaintiffs' position were to prevail, the inadequacy of witness fees provided by statute would no longer be tolerable under the Constitution, and the full value of the time of a witness under subpoena would be compensable. The expense would be enormous.

A comparison of this pervasive and highly onerous public burden with the characteristically moderate and limited restrictions on the use of evidentiary property clearly favors the State's position. Since article 12 does not socialize the cost of every civil obligation, we will follow the unbroken historical practice in holding that a temporary restriction on the use of private property held as evidence in criminal cases is not a compensable taking of property. *Accord Emery v. State supra.*

At this point the plaintiffs might well object that the general rule that we have derived on the basis of the normal case does not adequately answer their complaints. We have, after all, defined the normal case as one in which the restrictions on the use of property, however onerous, are limited by the need for the property as evidence. The plaintiffs could argue that their pleadings could be read as claiming that this was an abnormal case, in which the restrictions so exceeded what was reasonably necessary for evidentiary purposes that the continued imposition of the protective order was an abuse of discretion. They would therefore ask whether the proper owner has any recourse in these abnormal circumstances.

Our answer is that the owner does have recourse, but that the remedy is an appeal to this court rather than an award of money damages. To classify the abnormal case as a taking subject to compensation would, we fear, defeat the general rule, for every disputed restriction would lead to an action for inverse condemnation. The property owner's remedy lies, rather, in this court's authority to entertain a request for prospective review of such an order in any apparently egregious case. We do not, therefore, close the door either to an expedited interlocutory appeal of an evidentiary order or to a petition for relief by extraordinary writ. *See* RSA 490:4. In other words, the present plaintiffs followed the proper course when they sought immediate review of the superior court's restrictive

order during the pendency of the criminal case. We can add only that the plaintiffs appear to have had a claim worthy of such review. We have no record of the trial court's reasons for continuing its order in effect despite the plaintiffs' objections, and it is not apparent to us why photographs or other records could not have provided adequate evidence of the building's condition after the fire.

It remains for us to rule on the plaintiff's federal claim under the fifth amendment, which the fourteenth amendment makes applicable to State action. *See Webbs Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160 (1980). We think it is clear that the plaintiffs are entitled to no relief under the fifth amendment.

While the Supreme Court of the United States has not considered the exact issue before us, it has rejected the closely related claim that pretrial detention of a material witness is a compensable taking, in these words:

"[T]he Fifth Amendment does not require that the government pay for the performance of a public duty it is already owed. *See Monongahela Bridge Co. v. United States*, 216 U.S. 177, 193 (modification of bridge obstructing river); *United States v. Hobbs*, 450 F.2d 935 (Selective Service Act); *United States v. Dillon*, 346 F.2d 633, 635 (representation of indigents by court-appointed attorney); *Roodenko v. United States*, 147 F.2d 752, 754 (alternative service for conscientious objectors); *cf. Kunhardt & Co. v. United States*, 266 U.S. 537, 540. It is beyond dispute that there is in fact a public obligation to provide evidence, *see United States v. Bryan*, 339 U.S. 323, 331; *Blackmer v. United States*, 284 U.S. 421, 438, and that this obligation persists no matter how financially burdensome it may be. The financial losses suffered during pretrial detention are an extension of the burdens borne by every witness who testifies. The detention of a material witness, in short, is simply not a 'taking' under the Fifth Amendment, and the level of his compensation, therefore, does not, as such, present a constitutional question. '[I]t is clearly recognized that the giving of testimony and the attendance upon court or grand jury in order to testify are public duties which every person within the jurisdiction of the Government is bound to perform upon being properly summoned, and for performance of which he is entitled to no further compensation than that which the statutes provide. The personal sacrifice involved is a part of the necessary contribution of the individual to the welfare of the public.' *Blair v. United States*, 250 U.S. 273, 281."

*Hurtado v. United States*, 410 U.S. 578, 588–89 (1973) (footnotes omitted).

■ Although *Hurtado* dealt only with restrictions on witnesses' freedom of movement, its principle is not so limited. The examples cited in the foregoing quotation include burdens on property as well as on liberty, and several of the lower federal courts have applied the rule in *Hurtado* to hold that the government can require the owner of potential evidence to bear the financial burden of its deprivation or of its production for trial. *E.g., Haldeman v. Freeman*, 558 F. Supp. at 519–20 (D.D.C. 1983); *United States v. Friedman*, 532 F.2d at 934 (bank not entitled to reimbursement for cost of compliance with I.R.S. summons of a customer's records); *In re Grand Jury No. 76-3 (MIA) Subpoena Duces Tecum*, 555 F.2d at 1308–09 (no entitlement to reimbursement for cost of complying with subpoena duces tecum). Accordingly, we hold that the plaintiffs' declaration failed to state a cause of action under the fifth and fourteenth amendments.

*Affirmed.*

JOHNSON, J., did not sit; the others concurred.