64 P.3d 618 (2003)
148 Wash.2d 760
Linda EGGLESTON, Appellant,
v.
PIERCE COUNTY, Washington, Myron Smith, Randy Sweem, Roger Gooch, and Ben Benson, Respondents.
No. 71296-4.
Supreme Court of Washington, En Banc.
Argued June 25, 2002.
Decided March 6, 2003.
*620 Timothy Ford, Maria Fox, Seattle, for Appellant.
John Ladenburg, John Kugler, Tacoma, for Respondents.
Heller Ehrman White & McAuliffe, Timothy Butler, John Geyman, David Ward, Charles Wilkinson, Seattle, Amicus Curiae on Behalf of American Civil Liberties.
WAPA, Pamela Loginsky, Olympia, Amicus Curiae on Behalf of Wa. Association of Prosecuting Attorneys.
Groen Stephens & Klinge LLP, John Groen, Bellevue, Amicus Curiae on Behalf of Building Industry Association.
*619 CHAMBERS, J.
Linda Eggleston's home was rendered uninhabitable by the execution of a criminal search warrant and preservation order. She sought relief in state and federal court for alleged civil rights violations, including violation of article I, section 16 of the Washington State Constitution. Her claims in federal court have been stayed, and the Pierce County Superior Court dismissed her article I, section 16 claim at summary judgment. Today, we are asked only to determine whether she has suffered a compensable takings under article I, section 16 of the Washington State Constitution. We conclude she has not, and affirm.

FACTS
Mrs. Eggleston inherited a two-bedroom Tacoma home from her father in 1977. Mrs. Eggleston lived there with her adult son Brian Eggleston. Pierce County sheriffs received a tip that Brian was dealing drugs and placed the home under surveillance. Based on that surveillance, sheriffs obtained a search warrant. For safety reasons, officers decided to serve the warrants early in the morning of October 16, 1995. The team assembled at a nearby fire station and proceeded to the unlocked house.
Sheriff's deputies entered the house, a fire fight broke out, and one officer lost his life. Brian was arrested and charged with murder, assault, and various drug crimes. A law enforcement team specializing in homicide investigations searched the home and found drugs, cash, weapons, and drug paraphernalia.[1] *621 Brian has since been convicted of drug dealing, and awaits retrial on other charges. State v. Eggleston, noted at 108 Wash. App. 1011, 2001 WL 1077846, at *1 (2001).
That night, an officer took Mrs. Eggleston to her mother's mobile home. The parties disagree whether Mrs. Eggleston could have moved home after the homicide team completed its search that evening. Brian's defense counsel suggested she not go home until investigations were complete.
On April 15, 1996, the trial court signed a search warrant authorizing the seizure of evidence pertaining to the murder from Mrs. Eggleston's house. The search warrant specifically authorized the police to collect:
Video tapes of police television shows, blood samples, gunshot residue, bed sheet with bloody hand print, two upholstered chairs with bloodstains, [c]ollection of trace evidence. Any other evidence discovered during the reconstruction of the crime scene and documentation of the process with photographs and video taping, measuring, vacuuming, or other evidence techniques necessary to reconstruct the crime scene.
Clerk's Papers (CP) at 264. The search warrant commanded the officers to "diligently search for any evidence, and any other, and if ... evidence material to the investigation or prosecution of said felony ... be found ... bring the same forthwith before me, to be disposed of according to law." CP at 264.
Leaving a copy of the warrant on the family piano, officers collected evidence, including two walls. One wall was a load bearing wall, leaving the house unstable and uninhabitable. Two months later the trial judge issued an order prohibiting "the defense, and any person acting on behalf of the defendant" from "destroying any item of possible evidentiary value" and "preserv[ing] the scene which is the location of the acts ... in its entirety." CP at 127.[2] Mrs. Eggleston has cooperated with this order and has lived in her mother's mobile home ever since. She has not asked the trial court to modify this order to make it less burdensome upon her. While the attorneys discussed whether Mrs. Eggleston should be allowed to move back into her home, "it was kind of in limbo." CP at 282.
Brian has been charged and tried for murder, assault, and drug crimes. The first jury found him guilty of the drug and assault charges but deadlocked on murder; the second jury convicted him of second degree murder. See Eggleston, 108 Wash.App. 1011, 2001 WL 1077846, at *2. Both juries were taken to the house. The removed walls have *622 not been used as evidence. The Court of Appeals reversed the assault and murder convictions and remanded for a new trial. Eggleston, 2001 WL 1077846, at **1, 34. The order preserving the scene will remain in effect until either vacated or modified, or until the criminal case is complete.
Mrs. Eggleston has not been charged with any crime. Her income consists of $500 a month in social security benefits, $420 of which is dedicated to the rent on her mother's mobile home. In 1998, she filed a claim for damages with Pierce County. Pierce County rejected her claim. She then brought suit in state and federal court for the destruction and loss of use of her property under several theories, including takings under the Washington and United States Constitutions. Respondent Pierce County removed her state claims to federal court. The federal court issued a stay covering her federal claims and returned the state takings claim to the Pierce County Superior Court. Eggleston v. Pierce County, 99 F.Supp.2d 1280, 1283 (W.D.Wash.2000).[3] This state takings claim is the only issue before us.
Each party moved for summary judgment. The trial court judge granted summary judgment to the county. We accepted direct review.

ANALYSIS[4]
We are mindful that Mrs. Eggleston has suffered a tragic loss of real property. Her loss may be compensable under a variety of theories not before us, including violation of the fourth, fifth, and fourteenth amendments to the United States Constitution. She has pleaded facts that might give rise to a substantive due process claim. But her claim is not a cognizable takings.
Article I, section 16 is significantly different from its United States constitutional counterpart, and in some ways provides greater protection. See, e.g., Mfr'd Hous. Cmtys. of Wash. v. State, 142 Wash.2d 347, 356 n. 7, 13 P.3d 183 (2000). Generally, we require the parties to present a Gunwall analysis (State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986)) before we will consider their state constitutional contentions. See Mfr'd Hous., 142 Wash.2d at 356 n.7, 13 P.3d 183. However, in this case, we find that neither party was prejudiced by the lack of an early Gunwall analysis, and reach the substantive claim.[5]
The power and the obligation of eminent domain plays a critical role in constitutional governance, and courts are obligated to carefully monitor its exercise. The State is vested with the power to take real property for public use, but must compensate the owner appropriately. Const. art. I, § 16. Similarly, "[p]olice power is inherent in the state by virtue of its granted sovereignty." Mfr'd Hous., 142 Wash.2d at 354, 13 P.3d 183. The State is vested with the power to regulate for the health, safety, morals, and general welfare, and the burdens imposed incidental to such regulations are not takings unless the burdens manifest in certain, enumerated ways. See Guimont v. Clarke, 121 Wash.2d 586, 854 P.2d 1 (1993) (articulating analytical framework for evaluating substantive due process, per se and regulatory takings claims); Conger v. Pierce County, 116 Wash. 27, 36, 198 P. 377 (1921); Tahoe-Sierra Pres. Council, Inc., v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 122 S.Ct. *623 1465, 152 L.Ed.2d 517 (2002) (articulating requirements for federal regulatory takings); cf. Mugler v. Kansas, 123 U.S. 623, 668-69, 8 S.Ct. 273, 31 L.Ed. 205 (1887) (giving historical view).
Police power and the power of eminent domain are essential and distinct powers of government. Mfr'd Hous., 142 Wash.2d at 354, 13 P.3d 183; State ex rel. Long v. Superior Court, 80 Wash. 417, 419, 141 P. 906 (1914); see generally William B. Stoebuck, A General Theory of Eminent Domain, 47 WASH. L.REV. 553, 553-63 (1972). Courts have long looked behind labels to determine whether a particular exercise of power was properly characterized as police power or eminent domain.[6]See, e.g., Conger, 116 Wash. 27, 198 P. 377. But clearly, not every government action that takes, damages, or destroys property is a taking. "Eminent domain takes private property for a public use, while the police power regulates its use and enjoyment, or if it takes or damages it, it is not a taking or damaging for the public use, but to conserve the safety, morals, health and general welfare of the public." Conger, 116 Wash. at 36, 198 P. 377 (emphasis added). The gathering and preserving of evidence is a police power function, necessary for the safety and general welfare of society. Cf. Conger, 116 Wash. at 36, 198 P. 377.
Our constitution provides:
Eminent Domain. Private property shall not be taken for private use, except for private ways of necessity, and for drains, flumes, or ditches on or across the lands of others for agricultural, domestic, or sanitary purposes. No private property shall be taken or damaged for public or private use without just compensation having been first made, or paid into court for the owner, and no right-of-way shall be appropriated to the use of any corporation other than municipal until full compensation therefor be first made in money, or ascertained and paid into court for the owner, irrespective of any benefit from any improvement proposed by such corporation, which compensation shall be ascertained by a jury, unless a jury be waived, as in other civil cases in courts of record, in the manner prescribed by law. Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public: Provided, That the taking of private property by the state for land reclamation and settlement purposes is hereby declared to be for public use.
Const. art. I, § 16. The words of the constitution are interpreted as they would have been commonly understood at the time the constitution was ratified. State v. Brunn, 22 Wash.2d 120, 139, 154 P.2d 826 (1945). Based on the principles underlying our jurisprudence and evidence from an 1886 Oregon Supreme Court case, we conclude that in 1889, the production of evidence or testimony would not have been considered a taking.
In 1886, the Oregon Supreme Court determined that their takings clause (which included a prohibition on claiming the "particular services" of any man) did not require the state to compensate a witness for his testimony. Daly v. Multnomah County, 14 Or. 20, 12 P. 11 (1886). The Oregon court found the duty to provide testimony inherent in citizenship and concluded that duty was categorically distinct from any right to receive compensation under the takings clause. Daly, 14 Or. at 21, 12 P. 11 (quoting Israel v. State, 8 Ind. 467 (1856)); accord Blair v. United States, 250 U.S. 273, 281, 39 S.Ct. 468, 63 L.Ed. 979 (1919). The same principle applies to the production of evidence. Petitioner has not demonstrated that in 1889, the citizens of Washington would have understood the principles underlying police power *624 and takings significantly differently from the way they were understood by our Oregon neighbors. Therefore we conclude that in 1889, the duty to provide evidence would have not have given rise to a compensable taking.
Article I, section 16 requires prior compensation. It would be administratively awkward (and constitutionally unlikely) to require prior compensation for the destruction of property by police while apprehending a suspect or executing a search warrant. This is further evidence that article I, section 16 did not, in 1889 (or 1920 when it was amended), reach such claims. Further, the Washington State Constitution specifically states "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law," clearly evincing that from the beginning of our history the state has had the power to invade homes with the authority of law. Const. art. I, § 7 (emphasis added). Our state constitution does not provide for compensation for an article I section 7 search; more evidence the takings clause would not originally have been understood to cover this sort of claim.[7]
While this is a case of first impression in Washington, several of our sister states have already wrestled with it. After a careful survey, we are aware of no case that holds or even supports the proposition that the seizure or preservation of evidence can be a taking. Again, Oregon has considered the issue and declined to find a cognizable taking under its state constitution when evidence is substantially destroyed during a criminal investigation and prosecution. Emery v. Oregon, 297 Or. 755, 688 P.2d 72 (1984).
Emery considered the takings claim of a criminal defendant and his mother, co-owners of a pickup truck that was the site of a murder. Emery, 297 Or. at 757, 688 P.2d 72. As part of the investigation and prosecution of that murder, the truck was seized and dismantled. Id. It was returned to the defendant still dismantled. Id. The Oregon Supreme Court found no takings. It ruled:
"If a person, by virtue of his very existence in civilized society, owes a duty to the community to disclose for the purposes of justice all that is in his control which can serve the ascertainment of the truth, this duty includes not only mental impressions preserved in his brain and the documents preserved in his hands, but also ... the chattels and premises within his control. There can be no discrimination....
"Apart from specific privileges, * * *, a person is bound, if required to furnish ... his premises to the inspection of the tribunal or its duly delegated officers, and to do or exhibit any other thing which may in any form furnish evidence."
Emery, 297 Or. at 765-66, 688 P.2d 72 (footnote omitted) (quoting 8 John Henry Wigmore, Evidence § 2194, at 76 (John T. McNaughton rev., 1961)). Accord Alaska Dep't of Natural Res. v. Arctic Slope Reg'l Corp., 834 P.2d 134 (Alaska 1991) (no takings to require disclosure of a secret oil database); McCambridge v. City of Little Rock, 298 Ark. 219, 227-28, 766 S.W.2d 909 (1989) (seizure of evidence not a takings); McCoy v. Sanders, 113 Ga.App. 565, 148 S.E.2d 902 (1966) (no takings to drain a pond to look for a body); cf. City & County of Denver v. Desert Truck Sales, Inc., 837 P.2d 759 (Colo.1992) (no takings to seize truck for failure to display proper identification). Under the Oregon approach, no takings could arise from the execution of the warrant or preservation order. Nor could a takings be found in property damage caused by the investigation.
Similarly, the New Hampshire Supreme Court considered and rejected a claim that an order blocking the repair of an apartment during an arson trial was a taking. Soucy v. New Hampshire, 127 N.H. 451, 452, 506 A.2d 288 (1985) (Souter, J., writing). It also relied on Wigmore:
"For more than three centuries it has now been recognized as a fundamental *625 maxim that the public ... has a right to every man's evidence."
"[i]t may be a sacrifice of time and labor, and thus of ease, of profits, of livelihood. This contribution is not to be regarded as a gratuity, or a courtesy, or an ill-required favor. It is a duty not to be grudged or evaded. Whoever is impelled to evade or to resent it should retire from the society of organized and civilized communities, and become a hermit. He who will live by society must let society live by him, when it requires to."
Soucy, 127 N.H. at 455-56, 506 A.2d 288 (citations omitted) (quoting 8 Wigmore, supra, § 2192, at 70, 72). While the New Hampshire Supreme Court found no takings, it was sympathetic, as are we, to the burden imposed on the property owner. The court counseled that a "property owner's remedy lies ... in this court's authority to entertain a request for prospective review of such an order in any apparently egregious case." Soucy, 127 N.H. at 458, 506 A.2d 288. We agree. But we find no takings under the state constitution based on the seizure and preservation of evidence.
A harder question is whether the destruction of property by police activity other than collecting evidence pursuant to a warrant could ever be a compensable taking. Courts considering this issue are divided. See generally, David M. Neuenhaus, State Constitutional Takings Jurisprudence, 24 Rutgers L.J. 1352 (1992) (collecting cases). In Customer Co. v. City of Sacramento, 10 Cal.4th 368, 41 Cal.Rptr.2d 658, 895 P.2d 900 (1995), the California Supreme Court rejected a claim that property destruction during the course of apprehending a suspect could be a taking under the California Constitution.[8]Id. at 370, 41 Cal.Rptr.2d 658, 895 P.2d 900. After an exhaustive survey of the history and development of takings, the court concluded that the takings clause was never "applied in a literal manner, without regard to the history or intent of the provision ... [and was not] intended, and never has been interpreted, to impose a constitutional obligation upon the government to pay `just compensation' whenever a governmental employee commits an act that causes loss of private property." Id. at 378, 41 Cal.Rptr.2d 658, 895 P.2d 900. Accord Kelley v. Story County Sheriff, 611 N.W.2d 475, 477 (Iowa 2000) (valid exercise of police power and not a compensable takings to breakdown doors of an innocent property owner to serve a warrant).
The three states that have found a taking in the destruction of property by police during an arrest have rested on fairness and the continued blurring of police power and eminent domain.[9] The first state to find a potential cause of action under somewhat analogous circumstances was Texas. Steele v. City of Houston, 603 S.W.2d 786 (Tex. 1980).[10] Texas police had burned down an innocent person's home to eject suspects. Id. at 788. The Texas Supreme Court found that this was not inverse condemnation, but was nonetheless a taking. Id. at 789. "Recent decisions by this court have broadly applied the underlying rationale to takings by refusing to differentiate between an exercise *626 of police power, which excused compensation, and eminent domain, which required compensation." Id. at 789 (emphasis added).
The Minnesota Supreme Court relied on this holding in a similar case. See Wegner v. Milwaukee Mut. Ins. Co., 479 N.W.2d 38 (Minn.1991).[11] Police had used tear gas and grenades to drive a suspect from an innocent person's home, wreaking extensive damage. Id. at 38. The Minnesota high court found a cognizable takings claim. Id. Minnesota found its takings clause was designed to prevent burdens society should bear from being forced onto specific individuals, and not restricted to eminent domain. Id. at 39, 41-42; accord Wallace v. City of Atlantic City, 257 N.J.Super. 404, 608 A.2d 480 (Law Div.1992).
A clear split on clear grounds exists. Those courts rejecting takings claims based on police destruction of property have relied on the original understanding of the constitutions and the continuing vitality of the separate doctrines of eminent domain and police power. The courts that have found takings have been justifiably outraged by the destruction of real property owned by third parties utterly unconnected with the alleged crime. While we too feel the pull of the justness of the cause, the vehicle is not article I, section 16. We decline to abandon the framework established by our constitution. Accord Brunn, 22 Wash.2d at 139, 154 P.2d 826. The proper apportionment of the burdens and benefits of public life are best addressed to the legislature, absent a violation of a right held by an individual seeking redress under the appropriate vehicle.
We turn briefly to the federal case law on point. The United States Supreme Court has admonished that the takings clause must be read against the historical background of rights and obligations. "`[a]s long recognized, some values are enjoyed under an implied limitation and must yield to the police power.'" Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1027, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (quoting Pa. Coal Co. v. Mahon, 260 U.S. 393, 413, 43 S.Ct. 158, 67 L.Ed. 322 (1922)). The federal courts have considered the question of whether the seizure of evidence is a taking under federal constitutional law, and it appears to us that they would not find the injury to Mrs. Eggleston to be a takings.
The leading case is Hurtado v. United States, 410 U.S. 578, 93 S.Ct. 1157, 35 L.Ed.2d 508 (1973). In that case, material witnesses were jailed to assure their appearance in a criminal trial. The detained witnesses brought suit for compensation under the Fifth Amendment, alleging that their property interest in their own time and liberty had been taken. Hurtado, 410 U.S. at 579, 93 S.Ct. 1157. The United States Supreme Court ruled that every person has a duty to provide evidence, and the Fifth Amendment does not require the government pay for the performance of a public duty already owed:
It is beyond dispute that there is in fact a public obligation to provide evidence and that this obligation persists no matter how financially burdensome it may be. "... [T]he giving of testimony and the attendance upon court ... in order to testify are public duties which every person within the jurisdiction of the Government is bound to perform ... and for the performance of which he is entitled to no further compensation than that which the statutes provide. The personal sacrifice involved is a part of the necessary contribution of the individual to the welfare of the public." Blair v. United States, 250 U.S. 273, 281[, 39 S.Ct. 468, 63 L.Ed. 979 (1919)].
Hurtado, 410 U.S. at 589, 93 S.Ct. 1157 (footnote and citations omitted); accord United States v. Friedman, 532 F.2d 928 (3d Cir.1976).
Similarly, the Fifth Circuit found no takings in the seizure of evidence. The widow of Lee Harvey Oswald sought to recover the value of items of personal property seized in the investigation of President John F. Kennedy's assassination. Porter v. United States, 473 F.2d 1329 (5th Cir.1973). Subsequent to the seizure of the evidence, Congress enacted legislation to appropriate the items and to pay fair compensation. The *627 parties did not dispute that there had been a taking; the primary issue was when the taking took place, since the value of the evidence changed during the course of the investigation. The Fifth Circuit rejected the argument that the takings occurred when the evidence was seized. Id. at 1335. Instead, it ruled that the takings occurred when the government declared its intent to acquire the property for its own. Id. at 1336. "Up until then the government might very well have returned that which it had seized...." Id. Under Porter, merely holding evidence during an investigation does not constitute a taking.
When law enforcement exceeds its lawful powers, the injured have a right to redress. But if this occurred that October day, there are other, more suitable, remedies available. Extending takings to cover this alleged deprivation of rights would do significant injury to our constitutional system. We stress we do not examine the applicability of substantive or procedural due process, the fourth, fifth, or fourteenth amendments to the United States Constitution, Washington Constitution article I, section 7, arbitrary and capricious government action, outrage, trespass, 42 U.S.C. § 1983, or any other cause of action that might be brought. It may be that all would fail. We also stress that we have not been asked to review or limit the preservation order to ease the burden on Mrs. Eggleston. We instruct courts below that such orders must be as unobtrusive and as bearable as possible. See, e.g., Soucy, 127 N.H. at 458, 506 A.2d 288; accord United States v. Columbia Broad. Sys., 666 F.2d 364, 371-72 (9th Cir.1982) (recognizing equitable power in civil cases to allocate cost of discovery for nonparty witnesses to demanding party); Feigin v. Colo. Nat'l Bank, N.A., 897 P.2d 814, 820 (Colo.1995) (recognizing the court's equitable power to moderate subpoena that is unreasonable or oppressive).
Summary judgment is affirmed.
JOHNSON, MADSEN, BRIDGE, and OWENS, JJ., and SMITH, J.P.T., concur.
IRELAND, J. (concurring).
The majority correctly holds that the taking of physical evidence pursuant to a warrant for a criminal homicide investigation is an exercise of the police power "to conserve the safety, morals, health and general welfare of the public." Conger v. Pierce Co., 116 Wash. 27, 36, 198 P. 377 (1921).
However, I also agree with Justice Alexander that the reasoning of the Texas Supreme Court in Steele v. City of Houston, 603 S.W.2d 786 (Tex.1980), is persuasive in the extreme circumstance where an innocent third party's property is destroyed. The majority acknowledges that in this case removal of a load bearing wall rendered the home uninhabitable. Majority at 621. Further, the State obtained an order two months later prohibiting "`the defense, and any person acting on behalf of the defendant'" from "`destroying any item of possible evidentiary value'" and "`preserv[ing] the scene which is the location of the acts ... in its entirety.'" Majority at 621 (alteration in original) (quoting Clerk's Papers at 127).
Whether Mrs. Eggleston, who was not charged with any crime, was even covered by this order might be debated. This case is entirely distinguishable from Steele where the police burned down an innocent party's home to smoke out suspects. Whether Mrs. Eggleston was subject to the court's order or not, she was fully capable of seeking clarification or modification of the judge's order at any time, but to this day has not done so. Majority at 621.
Furthermore, in the majority opinion we consider only the eminent domain claim. Eggleston's other claims are unaffected. Therefore, I concur with the majority.
ALEXANDER, C.J. (dissenting).
I dissent. In my view we should adopt the reasoning of the Texas Supreme Court in Steele v. City of Houston, 603 S.W.2d 786 (Tex.1980), and reverse the summary judgment that the trial court granted here to Pierce County. In the Texas case, the court was asked to consider whether or not a provision in that state's constitution, which was almost identical to article I, section 16 of our *628 state's constitution, required the State to pay compensation to the owners of a house that had been burned down by the police in an effort to capture an escaped convict. The Texas court, while acknowledging that the destruction of the property was a "classic instance of police power exercised for the safety of the public," determined that it was nonetheless a taking of an innocent third party's property by the public for which the public must pay compensation. Steele, 603 S.W.2d at 793.
Here, deputies of the Pierce County Sheriff's Department rendered Mrs. Eggleston's property completely uninhabitable when they removed a load bearing wall during the process of executing a search warrant for videotapes, blood samples, gunshot residue, a bed sheet, two chairs, and other "evidence material to the investigation." Clerk's Papers at 264. Although Mrs. Eggleston is the mother of an individual who was charged with committing a crime in her house, there is no indication that she had any culpability for her son's transgressions. I believe, as did the Texas court in similar circumstances, that this was a taking, notwithstanding the fact that it was a consequence of the county's exercise of the police power. No individual should have to assume a burden of the magnitude the State would impose on Mrs. Eggleston.
I would, therefore, reverse the summary judgment order dismissing her cause of action and let this matter go to trial. At trial Mrs. Eggleston would have the opportunity to prove her entitlement to compensation for the diminution of the value of her home or restoration of it to the condition it was in when the search warrant was served. Because the majority upholds the summary judgment against her, I dissent.
SANDERS, J. (dissenting).
The ministers of the king cannot undermine, weaken, or impair any of the walls or foundation of any houses, be they mansion-houses, or out-houses, or barns, stables, dove-houses, mills, or any other buildings: and they cannot dig in the floor of my mansion-house which serves for the habitation of man; for this, that my house is the safest place for my refuge, safety and comfort, and of all my family; as well in sickness as in health, and it is my defence in the night and in the day, against felons, misdoers, and harmful animals; and it is very necessary for the weal public, that the habitation of subjects be preserved and maintained.[[1]]
I posit if government seizure and confiscation of one's living room wall is not a compensable taking, the words of our state Declaration of Rights have lost their meaning:
No private property shall be taken or damaged for public or private use without just compensation having been first made....
Wash. Const. art. I, § 16. The language of this provision yields but three questions: (1) Is this property?; (2) Was it taken or damaged?; and (3) Has just compensation been paid? Unlike today's majority opinion, the constitution does not except from its plain language property which is seized for evidentiary purposes, and there are no "words" in this provision of our constitution which could possibly have been understood at the time of its ratification to justify such an exception. Cf. State v. Brunn, 22 Wash.2d 120, 139, 154 P.2d 826 (1945); majority at 623 ("The words of the constitution are interpreted as they would have been commonly understood at the time the constitution was ratified.").
Rather the majority attempts to engraft a loosely phrased "police power" exception to the takings clause in a context quite different from that where a discussion of the police power might be reasoned or relevant.
In the spirit of what happened to Mrs. Eggleston's house, I suggest we "deconstruct" the majority's argument, and then test its strength at its foundation.
But this task may require a shovel and flashlight since these foundations are not clearly visible. Indeed it appears the majority concedes the essentials of a takings claim since it recognizes, as it must, that Mrs. *629 Eggleston's property has been taken, no compensation has been paid, and the seizure was consistent with "[t]he talisman of a taking [which] is government action which forces some private persons alone to shoulder affirmative public burdens, `which, in all fairness and justice, should be borne by the public as a whole.'" Mission Springs, Inc. v. City of Spokane, 134 Wash.2d 947, 964, 954 P.2d 250 (1998) (quoting Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)).
Rather than applying plain text and principled theory to examine the question, the majority appears to incant "police power" as some sort of mystical excuse to cart away part of a person's house without paying for it.
In this context the majority does at least concede "the term [police power] must be understood in the more limited sense it was then [1889], not necessarily now." Majority at 623 n. 6. But the majority does not tell us what was ordinarily meant by the term in 1889 in the context of a takings claim, let alone this one, much less reconcile the purported doctrine with our constitutional text. Further foundation work therefore seems warranted.
To begin, I do not see "regulatory" taking jurisprudence particularly germane since "regulatory" takings typically involve governmental restrictions on use as opposed to outright seizure, occupation, or physical invasion. See San Diego Gas & Elec. Co. v. City of San Diego, 450 U.S. 621, 652-53, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting). We therefore must recognize the facts of this case plainly bespeak of a physical invasion, physical seizure, and confiscation, not an alleged regulatory taking by excessive use restriction.
This having been said, it is certainly true that our court, and other courts in general, have recognized certain exercises of the police power may not yield a subject for compensation under the Fifth Amendment to the United States Constitution or article I, section 16 of the state constitution. One such case, cited and relied upon by the majority, is Conger v. Pierce County, 116 Wash. 27, 36, 198 P. 377 (1921). Conger was an action to recover damages caused by erosion resulting from county changes and improvements to the Puyallup River bank. The county defended by claiming that while the damage admittedly occurred, it was a consequence of the county's legitimate exercise of the police power and therefore not subject to compensation. While our court recognized the theory, it found it inapplicable to those facts because the improvements were not made "to preserve public health, peace, morals or welfare," but rather to reclaim large tracts of wasteland. Conger, 116 Wash. at 38, 198 P. 377. This, opined the court, was an exercise of the power of eminent domain, not a legitimate exercise of the police power, no matter what the government called it. Such is also the distinction I think relevant here.
Referring to the police power, Conger noted:
Because of its elasticity and the inability to define or fix its exact limitations, there is sometimes a natural tendency on the part of the courts to stretch this power in order to bridge over otherwise difficult situations, and for like reasons it is a power most likely to be abused. It has been defined as an inherent power in the state which permits it to prevent all things harmful to the comfort, welfare and safety of society.... Regulating and restricting the use of private property in the interest of the public is its chief business.... It does not authorize the taking or damaging of private property in the sense used in the constitution with reference to taking such property for a public use.
Conger, 116 Wash. at 35-36, 198 P. 377.
Conger further illuminates the doctrine by reference to 1 John Lewis, A Treatise on the Law of Eminent Domain § 6 (2d ed.1900):
"Everyone is bound so to use his own property as not to interfere with the reasonable use and enjoyment by others of their property. For a violation of this duty the law provides a civil remedy. Besides this obligation, which every property owner is under to the owners of neighboring property, he is also bound so to use and enjoy his own as not to interfere with the general welfare of the community in which he lives.... Whatever restraints the legislature *630 imposes upon the use and enjoyment of property within the reason and principle of this duty, the owner must submit to, and for any inconvenience or loss which he sustains thereby, he is without remedy. It is a regulation, and not a taking, an exercise of police power, and not of eminent domain. But the moment the legislature passes beyond mere regulation, and attempts to deprive the individual of his property, or of some substantial interest therein under the pretense of regulation, then the act becomes one of eminent domain, and is subject to the obligations and limitations which attend an exercise of that power."
Conger, 116 Wash. at 36-37, 198 P. 377. Although the majority cites Conger for the proposition that "[t]he gathering and preserving of evidence is a police power function, necessary for the safety and general welfare of society," majority at 623, there is nothing whatsoever in Conger to suggest or support that proposition. To the contrary Conger distinguishes between police power regulations which restrict the harmful use of property on the one hand and "attempts to deprive the individual of his property," an exercise of eminent domain, on the other.
I posit the case at bar is obviously of the latter category since there was nothing harmful or offensive about the walls which were removed nor did the removal of the walls have anything to do with any governmental purpose or regulation to restrict its harmful use. By all accounts, these walls were innocent.
Ernst Freund's 1904 treatise put it quite succinctly: "[I]t may be said that the state takes property by eminent domain because it is useful to the public, and under the police power because it is harmful." Ernst Freund, The Police Power: Public Policy and Constitutional Rights § 511, at 546-47 (1904).[2] This text was written close to the birth of our Declaration of Rights and reflects its Zeitgeist.
The distinction between the prevention of harmful activities, which may not be a taking, and the acquisition of private property for the public good, which is a taking, is unfortunately lost on our majority, although it is recognized or at least applied in most of the cases cited by the majority.
In Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), for example, the distinction was applied to state the police power regulations which abate nuisances, for which no compensation for a taking is required as opposed to restrictions on uses "previously permissible under relevant property and nuisance principles," id. at 1029-30, 112 S.Ct. 2886, which do require compensation. Viewed in this light, earlier Supreme Court cases to the same effect, including Mugler v. Kansas, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887) (law prohibiting manufacture of alcoholic beverages not a taking) and Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928) (order to destroy diseased cedar trees to prevent infection of nearby orchards not a taking), make perfect sense.
And the doctrine fits neatly within the plain meaning of the words of our state constitution as well, since "property" is certain rights pertaining to a thing, not the *631 thing itself.[3] "Property" is therefore often analogized to a bundle of sticks representing the right to possess, exclude, alienate, etc. Manufactured Hous. Communities of Wash. v. State, 142 Wash.2d 347, 366-67, 13 P.3d 183 (2000). However, one stick not in the bundle is the right to use one's property in a manner harmful to one's neighbor. Consequently restrictions designed to abate harmful uses or nuisances do not take "property" because there is no property right to do these things in the first instance, i.e., no property right for the government to take.[4] We have recognized "[i]t is permissible for legislative bodies to wield police power to prevent activities which are similar to public nuisances." Sintra v. City of Seattle, 119 Wash.2d 1, 15, 829 P.2d 765 (1992). This principle can be traced all the way back to Glanville's admonition in 1187 that "a person may not use his or her own property to the detriment of another." Steven J. Eagle, Regulatory Takings § 3-2, at 218 (2d ed.2001) (citing David A. Thomas, Thompson on Real Property § 72.02 (1994) (quoting Ranulf de Glanville, The Laws and Customs of the Kingdom of England or De Legibus et Consuetudinibus Regni Angliae (1187-1189) bk. 13, chs. 32-39, at 334-43 (John Beame trans., 1812))).
Of course seizure of Mrs. Eggleston's walls is not an effort to prevent the use of the walls to the detriment of someone else but is rather a confiscation to facilitate the criminal process, a public good if there ever was one. Jails and courthouses also facilitate the criminal process. But if the government attempts to seize one from a private owner, it must do so the old fashioned way: pay for it. And when the government takes Mrs. Eggleston's walls out of her house, equally it must pay for the walls because it is not exercising its police power to prevent the harmful use of property but rather its eminent domain power to seize private property for public use. In Freund's parlance, it takes the walls because they are useful to the public, not because the walls are harmful.
Last, I come to the majority's discussion of out-of-state cases which have denied compensation to owners of property seized for evidentiary purposes.
At the top of the majority's list is Emery v. Oregon, 297 Or. 755, 688 P.2d 72 (1984). Emery involved a truck seized as evidence in a criminal prosecution, dismantled and ultimately returned to the owner in pieces. A majority of the Oregon Supreme Court rejected a takings claim, analogizing to Hurtado v. United States, 410 U.S. 578, 93 S.Ct. 1157, 35 L.Ed.2d 508 (1973), a case which denied reasonable compensation under the Fifth Amendment (not the Washington Constitution) to aliens detained and incarcerated as material witnesses. True, the United States Supreme Court denied a takings claim under those facts, but it is certainly more than arguable that the obligation to attend a proceeding as a material witness is not "property" in the constitutional sense.[5] And imposing the obligation on one to attend trial as a witness arguably lacks the transferability *632 attribute that is normally associated with eminent domain. See William B. Stoebuck, A General Theory of Eminent Domain, 47 Wash. L.Rev. 553, 599 (1972) ("it is a power of government by which property of private persons may be transferred to the government...."). Moreover, none of the cases cited in Hurtado involved takings claims stemming from the seizure of physical evidence.
I also note the strong dissent by former Oregon Supreme Court Justice Hans Linde, an acknowledged state constitutional law expert and also former law clerk to Washington's own Justice William O. Douglas.[6] Linde opined: "If the state needs to disassemble, destroy, or substantially damage such property in the course of its investigation, the state either must reassemble, repair, or replace the property or bear the owner's cost in having this done." Emery, at 767-68, 688 P.2d 72. Linde's criticism of the majority analysis was quite incisive:
Faced with this holding, the majority in this court in turn needlessly pronounces some very questionable constitutional law. Those pronouncements are questionable because the state doubtless would have to pay compensation if it used plaintiffs' pickup truck for some other public purpose, for instance for transportation and the compensation would take into account any diminution in value from wear and tear or damage during the state's use. The majority's conclusion that failure to return or restore property used as evidence in unharmed condition does not require compensation, hangs entirely on an analogy with decisions holding that private persons have no constitutional claim to be compensated for serving as witnesses or jurors.
... But there is no need to pursue these analogies, for plaintiffs have made no claim to be compensated for the state's temporary takings of their pickup truck, and without such a claim the state understandably has not invoked any analogy to the public duty to testify or serve as a juror.
The majority's constitutional law also is questionable because it has no principled limits. First, it is by no means limited to the present facts. Property used for evidence may belong to anyone, to a bystander, a landlord, or a business that happens to have the requisite item. The majority's holding would be the same if the vehicle cut up in the state's investigation belonged to Hertz or Avis. The holding would apply if the dismantled property [were] a Greyhound bus or someone's motor home, an expensive camera or a fine watch. It would be the same if the vehicle belonged to the victim of the crime or had been stolen from some third person. Under the majority's theory, all that these victims would be entitled to have returned or restored to them are the pieces left after the state destroyed the vehicle in its investigation.
Id. at 768-70, 688 P.2d 72 (footnote omitted).
I agree with Justice Hans Linde that the Oregon Supreme Court's treatment of this issue is not persuasive. Accordingly there is no reason to follow it.
By the same token, Soucy v. New Hampshire, 127 N.H. 451, 506 A.2d 288 (1985) (written by then state supreme court Justice Souter), which denied a takings claim by an apartment house owner who was prevented from repairing the building because it was needed in an arson investigation, is also unpersuasive. First, the New Hampshire Supreme Court characterized the governmental action as an exercise of the judicial power, not the police power. The court then attempted to "balance" the cost to the private property owner against the benefit inuring to the government if it were required to pay nothing, relying heavily on Emery v. State and its analogy to compelled testimony.
Aside from the weakness of Emery previously noted, I find the New Hampshire case unpersuasive because it undermines the most fundamental principle of takings law: no individual should be required to shoulder the cost of providing public goods absent just compensation. Of course it is cheaper for government to steal property than to pay for it, but the takings clause is there precisely to *633 challenge government's propensity to achieve its "desire by a shorter cut than the constitutional way of paying for the change." Pa. Coal Co. v. Mahon, 260 U.S. 393, 416, 43 S.Ct. 158, 67 L.Ed. 322 (1922).
But I do find the Texas Supreme Court's analysis in Steele v. City of Houston, 603 S.W.2d 786 (Tex.1980) very persuasive. There, owners and residents of a house brought suit against the city for property damage suffered when the police set fire to their home in an effort to recapture escaped convicts hiding in the house. The Texas Supreme Court reversed a lower court dismissal of a claim under article I, section 17 of the Texas Constitution, which provides "`No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made....'" Id. at 788 (quoting Texas Const. art. I, § 17). The Texas Supreme Court held:
The City argues that the destruction of the property as a means to apprehend escapees is a classic instance of police power exercised for the safety of the public. We do not hold that the police officers wrongfully ordered the destruction of the dwelling; we hold that the innocent third parties are entitled by the Constitution to compensation for their property.
Id. at 793. I can think of no reason why Mrs. Eggleston should not be afforded similar treatment under our state constitution. Certainly her property was taken, she was paid nothing, and she is being required to shoulder a public burden which, in all justice, should be borne by all of society, not herself alone.
I therefore dissent.
NOTES
[1] Brian Eggleston challenged the constitutionality of this search in his criminal trial, and Mrs. Eggleston challenges it separately in federal court. See State v. Eggleston, at 108 Wash.App. 1011, 2001 WL 1077846, at **13-14 (2001); Eggleston v. Pierce County, 99 F.Supp.2d 1280 (W.D.Wash.2000) (stayed federal court proceeding). The Court of Appeals noted that the October 16, 1995 search was warrantless, but ruled that any evidence that would have been discovered under the original drug warrant would be admissible. Eggleston, 108 Wash.App. 1011, 2001 WL 1077846, at *14. The reasonableness of the search is not before us.
[2] The order recites:

THIS MATTER having come on regularly before the above-entitled court upon the motion of defendant to prevent the State of Washington from attempting to obtain a search warrant to enter the crime scene and/or to seize evidence therefore; and upon the motion of the State of Washington, plaintiff herein, to require the defense to preserve the crime scene intact and to refrain from destruction of any items of possible evidentiary value pending further order of this Court; and the court being familiar with the records and files herein, having heard argument of counsel, and being of the opinion that such an Order should issue, and having verbally entered these orders on June 13, 1996; it is hereby
ORDERED, ADJUDGED AND DECREED that the plaintiff, State of Washington, shall not apply for or obtain a search warrant to enter the crime scene or to seize evidence from said crime scene; it is further
ORDERED, ADJUDGED AND DECREED that the defense, and any person acting on behalf of the defendant, is hereby restrained and prohibited from destroying any item of possible evidentiary value which is related to the incident which gave rise to the charges herein; and the defense is hereby ordered to preserve the scene which is the location of the acts which gave rise to the charges herein in its entirety and to prevent any individual from destroying any item of potential evidentiary value from said scene.
CP at 126-27 (Order Requiring Preservation of Scene & Prohibiting Search Warrant).
[3] The federal district court found it an inappropriate breach of comity to reach the claims based on the Fourth Amendment until Brian Eggleston's criminal trial and appeal were concluded. Eggleston, 99 F.Supp.2d at 1282. This determination was upheld by the Ninth Circuit Court of Appeals in an unpublished opinion. The court also found it inappropriate to reach the federal takings claim until our state courts had an opportunity to consider the issue under our own constitution. Id. Mrs. Eggleston is, of course, free to pursue her federal claims in federal court as they ripen and as comity concerns fade.
[4] This case is here on summary judgment, presenting only questions of law. Review is de novo. Rivett v. City of Tacoma, 123 Wash.2d 573, 578, 870 P.2d 299 (1994).
[5] Further, a satisfactory Gunwall analysis was provided by an amicus, and we find that the threshold function Gunwall performs is less necessary when we have already established a state constitutional provision provides more protection than its federal counterpart. Accord State v. White, 135 Wash.2d 761, 769, 958 P.2d 982 (1998).
[6] We recognize "police power" has been used elastically and imprecisely since adoption of our constitution in 1889. See, e.g., Hugh D. Spitzer, Municipal Police Power in Washington State, 75 Wash. L.Rev. 495 (2000). Therefore, for the purpose of our taking analysis the term must be understood in the more limited sense as it was then, not necessarily now. Moreover, we also recognize even a legitimate exercise of police power, as those terms were understood in 1889, may also result in a compensable taking where the regulation goes "too far." Pa. Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922).
[7] The parties do not address the relevance, if any, of the judiciary's independent constitutional authority to enter preservation orders or search and arrest warrants. Clearly, the judiciary can not exercise eminent domain and may rearrange property rights in accordance with law without it being a taking of property. See Wash. Const. art. IV; State v. Fields, 85 Wash.2d 126, 530 P.2d 284 (1975); RCW 2.04.190 ("The supreme court shall have the power to prescribe ... [the process] of taking and obtaining evidence.").
[8] The California Constitution says in part: "Private property may be taken or damaged for public use only when just compensation ... has first been paid." Cal. Const. art. I, § 19. The California Supreme Court's opinion is especially important to our analysis since because its takings clause was a model for our own. Robert F. Utter & Hugh D. Spitzer, The Washington State Constitution: A Reference Guide 30 (2002).
[9] See generally Arvo Van Alstyne, Inverse Condemnation: Unintended Physical Damage 20 HASTINGS L.J. 431 (1969); Arvo Van Alstyne, Statutory Modification of Inverse Condemnation: Deliberately Inflicted Injury or Destruction, 20 STAN. L.REV. 617 (1968); Louise A. Halper, Tropes of Anxiety and Desire: Metaphor and Metonymy in the Law of Takings, 8 YALE J.L. HUMAN. 31 (1996); Glynn S. Lunney, Jr., Article, A Critical Reexamination of the Takings Jurisprudence, 90 MICH. L.REV. 1892 (1992); C. Wayne Owen, Jr., Everyone Benefits, Everyone Pays: Does the Fifth Amendment Mandate Compensation when Property is Damaged During the Course of Police Activities? 9 Wm. & Mary Bill Rts. J. 277 (2000); Frank J. Wozniak, Right to Compensation for Real Property Damaged by Law Enforcement Personnel in Course of Apprehending Suspect, 23 A.L.R. 5th 834 (1994).
[10] The Texas constitution provides in relevant part: "No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made." Tex. Const. art. I, § 17.
[11] Minn. Const. art. I, § 13 reads: "Private property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured."
[1] The Case of the King's Prerogative in Saltpetre, 12 Coke 12, 77 Eng. Rep. 1294, 1296 (K.B.1606) (Lord Coke).
[2] An extremely articulate explanation is also provided by Roger Pilon:

We come then to the basic question: When does government have to compensate owners for the losses they suffer when regulations reduce the value of their property? The answers are as follows.
First, when government acts to secure rightswhen it stops someone from polluting on his neighbor or on the public, for exampleit is acting under its police power and no compensation is due the owner, whatever his financial losses, because the use prohibited or "taken" was wrong to begin with. Since there is no right to pollute, we do not have to pay polluters not to pollute. Thus, the question is not whether value was taken by a regulation but whether a right was taken. Proper uses of the police power take no rights. To the contrary, they protect rights.
Second, when government acts not to secure rights but to provide the public with some goodwildlife habitat, for example, or a viewshed or historic preservationand in doing so prohibits or "takes" some otherwise legitimate use, then it is acting, in part, under the eminent domain power and it does have to compensate the owner for any financial losses he may suffer.
Roger Pilon, When is Compensation Required?, Cato Handbook for the 107th Congress 210 (Jan. 10, 2001), available at http://www.cato.org/pubs/.
[3] William B. Stoebuck, A General Theory of Eminent Domain, 47 Wash. L.Rev. 553, 600 (1972).
[4] See Douglas W. Kmiec, The Original Understanding of the Taking Clause Is Neither Weak Nor Obtuse, 88 Colum. L.Rev. 1630, 1635 (1988) ("The distinction between harm and benefit also has historical roots traceable to the influence it had upon the drafters and ratifiers of the fifth amendment. It is well accepted, for example, that the drafters of the fifth amendment were greatly familiar with Blackstone's legal commentaries. Blackstone defined property as that claim and exercise `over the external things of the world, in total exclusion of the right of any other individual in the universe.' Blackstone's notion of `total exclusion' thus denies the existence of a property right when there is an interference with, or harm to, another's property. Legal dictionaries at the time of the founding paralleled Blackstone, noting that the law precluded the use of property in a manner that would `injure his neighbor.'[Fn. 34: E.g., G. Jacob, A New Law Dictionary (10th ed. London 1782)]. Significantly, the drafter of the taking clause, James Madison, incorporated the Blackstonian definition in his writing on property and specifically excluded uses of property that harmed others by not `leav[ing] to every one else the like advantage.'" (footnote omitted)).
[5] "`Anyone who frees himself from the crudest materialism readily recognizes that as a legal term property denotes not material things but certain rights.'" See William B. Stoebuck, A General Theory of Eminent Domain, 47 Wash. L.Rev. 553, 600 n. 154 (1972) (quoting Morris R. Cohen, Property and Sovereignty, 13 Cornell L.Q. 8, 11 (1927)).
[6] Justice Robert F. Utter, Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights, 7 U. Puget Sound L.Rev. 491, 508 (1984).